**People ex rel. Edward J. Barrett, v. Liberty State Bank. Charles H. Albers, Successor Receiver, Appellee, v. Tau Kappa Epsilon Fraternity, Appellant.**

**Gen. No. 9,215.**

Heard in this court at the October term, 1939. Opinion filed March 7, 1940. Rehearing denied April 3, 1940.

MARTIN, HOOSE & DEPEW, of Bloomington, for appellant.

CARTER PIETSCH, of Bloomington, for appellee.

MR. JUSTICE HAYES delivered the opinion of the court.

This is an appeal from the circuit court of McLean county, Illinois, by the Tau Kappa Epsilon Fraternity, appellant, seeking to reverse the decree entered in that court, which held that a payment of $3,589.34, made on May 24, 1933, by the Liberty State Bank of Bloomington, Illinois, after it was closed by the moratorium and before the appointment of a receiver, constituted unlawful preference.

It appears from the evidence in the case that at the time of the closing of the bank in March, 1933, by the State Bank moratorium, the Tau Kappa Epsilon Fraternity was the owner of five certificates of deposit totaling $3,589.34; that said certificates were canceled on May 24, 1933, during the suspension of business by said bank; that the cash at the bank was reduced by that amount, and that the appellant received the said amount.

Appellant contends that the deposits, included in the certificates in question, amounted to a deposit for a

specific purpose; that the bank received said funds with the express understanding that it was to reinvest it in other bonds; that it was not lawfully entitled to use them as part of its general assets; that the title did not pass nor was there a relationship created between the bank and appellant of debtor and creditor, but was one of a constructive trust, and that the cashing of the certificates by appellant while the bank was closed did not amount to a preference and was not unlawful.

Appellee's position is that the cashing of the certificates of deposit amounted to a preference which was unlawful; that the bank made no agreement for a special deposit; and that the deposits were not impressed with a trust.

R. E. Shearer, who was national treasurer of the Tau Kappa Epsilon Fraternity, was also, at the time of these transactions, cashier of the Liberty State Bank. At different times beginning with October 25, 1930, and up to December 20, 1932, he deposited in the bank certain funds belonging to the fraternity. These funds were derived from interest and sale of securities belonging to the fraternity. The bank issued certificates of deposit representing the various amounts deposited.

The vital question in the case is whether or not there was an agreement between appellant and the bank, covering these deposits, which would earmark them and restrict their use to the specific purpose of reinvesting in other bonds.

In determining this question, it is necessary to consider carefully the facts and circumstances surrounding the transactions at the time of their occurrence. The cashier and president of the bank testified at the trial. In their testimony there is an apparent effort to reconstruct these transactions so as to create a trust. It further appears that the bank never reopened,—as it was hopelessly insolvent; that the cashier was not connected with the bank at the time of the trial,—but

in another occupation, and that the real parties in interest were the bank depositors,—not the former officers of the closed bank. The cashier testified: "The sale of the Commonwealth Edison Bonds was made at the suggestion of an investment counsellor in Chicago, who handled the account of the bank. I had listed with him also, the bonds of the fraternity, and a list of the bonds of one or two other customers of the bank. He did not know, however, that they were of separate ownership. During the month of December, as I recall, the market was very erratic, and these particular ones were recommended for sale by this investment counsellor. He recommended the sale of these by telephone, and as I recall, he set up the reasoning that the Insull Securities, even their operating properties, would undoubtedly suffer a serious deflation in the next few months, and I think probably over the telephone in that conversation, I listed these bonds for sale, with the thought then in mind that the bank would hold the funds for the specific purpose of reinvestment, either in that same issue after some deflation had shrunken out of them or in such other bonds as might be recommended by him. It was rather thought and it was the conversation that the deflation might be temporary and that a person could go in and pick the bonds back up at a much lower figure. During the same month, or at least during the same general time, a considerable portion of the bank's bond portfolio was sold upon this same man's recommendation."

The circumstances of Shearer, the national treasurer and chief fiscal officer of appellant, acting in the dual capacity of cashier of the bank and agent of the appellant, makes it difficult to determine just what the legal effect of his acts were and from his own testimony it appears they were loose, indefinite and uncertain so as to prevent the basing of an agreement thereon, which would be injurious to the other depositors.

The president of the bank testified that at the time of one of the transactions, the cashier told him about these funds and suggested they be carried as a trust fund. The testimony of these two officers appeared to be an afterthought and not of that character that carries conviction and establishes an agreement that would create a trust which would entitle appellant to a preference over the other bank depositors.

Upon an examination of the certificates it appears that all five of them are in the usual form generally used by banks, and all are made payable to the order of appellant, in current funds, on the return of the certificates properly indorsed. Nothing appeared on them indicating they were to be reserved for any specific purpose nor were they designated as a trust fund in any way.

Appellant fared well in having its national treasurer inside the bank in May, 1933, who withdrew the amount of its claim, which resulted in appellant being paid $3,589.34 in cash, ahead of all other creditors and prior to an adjudication fixing the rights of the creditors.

The general rule with respect to deposits is that they will be deemed general unless the contrary satisfactorily appears and that the relation of the depositor and the bank will be one of creditor and debtor and not of agent and principal or trustee and beneficiary. It is essential to the creation of a special deposit that the character of the deposit be established at the time the same is made and that it be given and accepted under an agreement that it is to be treated as a special deposit. There is nothing in this record to establish any understanding and agreement between the fraternity and the bank with respect to the character of these deposits. The money represented by the certificates of deposit went into and was commingled with the general funds of the bank. There was no segregation of the money when it was deposited nor at any other time subsequent thereto. True it was that the general funds of the bank were augmented by the de-

posits but this in itself does not impress them with the character of a trust.

The decree of the circuit court provided that no payment be made upon the claim of the appellant until the disbursement to the other common creditors shall have reached sufficient proportions so as to make their percentage equal to the preference already made to appellant, and thereafter appellant was to prorate with the other general creditors.

We are of the opinion that the decree of the circuit court is supported by the facts in this record and in keeping with sound public policy and fair dealing in administering the law between the several depositors of a closed bank. The decree of the circuit court is therefore affirmed.

*Decree affirmed.*