110 Ill. App.3d 492 (1982)
442 N.E.2d 586
BANK COMPUTER NETWORK CORPORATION, Plaintiff-Appellant,
v.
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO et al., Defendants-Appellees.
No. 81-2205.
Illinois Appellate Court  First District (4th Division).
Opinion filed November 12, 1982.
*493 Bowles, Becker & Levine, Ltd., of Chicago (Allan I. Becker, Clyde O. Bowles, Jr., William A. Von Hoene, Jr., and Karen Taylor-Collen, of counsel), for appellant.
Alan N. Salpeter, Janet L. Reed, and Paula J. Morency, all of Mayer, Brown & Platt, of Chicago, for appellees.
Affirmed in part, reversed in part and remanded.
JUSTICE LINN delivered the opinion of the court:
Plaintiff, Bank Computer Network Corporation (Bankcom), brought this action in the circuit court of Cook County claiming that defendants, Continental Illinois National Bank (Continental) and one of its vice-presidents, Patrick Goy (Goy), improperly setoff funds in Bankcom's checking account against a debt owed by Bankcom to Continental on two promissory notes. Continental counterclaimed, seeking judgment for the balance due on the same promissory notes. Following extensive discovery on both sides, Continental moved for summary judgment on all four counts in Bankcom's complaint and on its own counterclaim. The trial court granted both motions.
Bankcom appeals, claiming that the trial court erred in entering summary judgment on behalf of Continental and Goy because Bankcom had raised genuine issues of material fact on each of the counts in its complaint. After examining the pleadings, the extensive legal memoranda, and the voluminous depositions, affidavits, and transcripts of oral argument, we find that a genuine issue of material fact on Bankcom's claim of promissory estoppel does exist; therefore, the entering of summary judgment on that issue in favor of Continental and Goy was improper. Accordingly, with respect to that issue, we *494 reverse and remand.

FACTS
Bankcom is a publicly owned corporation primarily engaged in the development and manufacture of automatic banking machines. As part of its growth strategy, it became a corporate customer of Continental in 1974. Among the various banking relationships maintained by the two parties were a corporate checking account, a frequently utilized line of credit, and other individual loan arrangements. As of October 1, 1977, Bankcom had a $150,000 outstanding loan due Continental. On October 31, 1977, following the receipt of an extension on the loan, Bankcom executed an unsecured promissory note (the October note) for the $150,000 plus interest, due on January 30, 1978.
In November of the same year, Bankcom requested an additional loan of $100,000 from Continental to finance the continuing development of a new automatic teller machine, the "Bankette." Continental initially denied this request but later agreed to lend Bankcom $50,000, in return for which Bankcom executed a second unsecured promissory note (the November note) due on February 13, 1978. All the negotiations were conducted by Leonard Fish, president and a director of Bankcom, and Patrick Goy, a second vice-president of Continental.
Even though the commercial relationship between Bankcom and Continental appeared to be ongoing, Continental's lending officers had noted in their records as far back as September 1977 that the bank was anticipating a termination of the relationship by the end of the year. Depositions of various bank officers established that Fish was a difficult customer to deal with, and the repeated overdrafts in the corporate checking account, although covered by the bank, were causing Goy problems in the management of his department section and in his harmonious relations with his superiors. Consequently, in November and December of 1977, Continental informed Bankcom in writing that the bank expected payment of both the October and November notes at their respective maturity dates; Bankcom responded that it expected to pay the notes when due, to terminate its relationship with Continental as soon as the notes were retired, and to secure future financing from another bank.
Prior to the January 30, 1978, maturity date, however, Howard Weiss, one of Bankcom's directors, began negotiating with Goy for an extension of both the October and November notes and for an additional $300,000 loan to Bankcom. Those negotiations continued past the maturity date of the October note, and Continental made no effort to collect. On February 6, 1978, Goy and Weiss orally agreed that *495 Continental would (1) extend the existing $200,000 loan provided Bankcom secured the loan with a $125,000 irrevocable letter of credit from Itel Data Services Corporation and a $75,000 personal guarantee from Fish, and (2) advance Bankcom additional funds, to be guaranteed by other officers, directors, or financial supporters of Bankcom. However, on February 14, 1978, Goy informed Weiss in a handwritten note that the February 6 agreement was contingent on Fish's personal guarantee of the entire $200,000 instead of the originally agreed-upon $75,000. Also on February 14, Goy sent Fish a letter expressing Continental's desire to be paid in full on the maturity dates of the notes, outlining the additional loan and guarantee procedures discussed by Goy and Weiss, but warning that the letter was not a specific proposal to advance funds to Bankcom. The letter concluded with the statements, "The present borrowing and future borrowings will be on a secured demand note with interest * * *. This in general terms outline [sic] a rather detailed program of structuring the credit facility for the company. It is not meant to be a proposal to advance funds, but a basis for future discussion."
During the morning of February 21, 1978, Goy received notice from Continental's bookkeeping division that if all Bankcom's checks presented that day were to be paid, Bankcom's checking account would be overdrawn $10,270.39. Goy called Fish to inform him of the situation, whereupon Fish told Goy that deposits were in the mail and listed the specific items and amounts. Goy responded, "Fine." Although Bankcom actually showed a positive ledger balance, certain of the funds were as yet uncollected; Continental therefore returned one check for approximately $30,000 and thus prevented an overdraft. Subsequent mail notice was sent to Fish.
Later in the afternoon of February 21, 1978, Goy called Weiss to inform him that the bank's final position regarding any loan agreement was to consider future advances only if Weiss' personal guarantee was collateralized. A proposed alternative would be a loan by Continental to Weiss and his brother in return for their personal collateralized guarantees; they in turn would loan the money to Bankcom. A third possibility was Continental's agreeing to provide Bankcom with interim financing, guaranteed by the individual guarantors, during which Bankcom would move to another bank and secure new loans with which to pay the notes due Continental as well as to finance future development. Goy represented Continental as wanting to be "considerate of [Bankcom's] needs" during the transition, whereupon Weiss said he would soon be in touch with Goy.
On the next day, February 22, 1978, Goy, orally and by letter, informed *496 Fish that Continental "confirmed" its demand for immediate payment of the entire balance of principal and interest on the two notes; accordingly, Goy had ordered the entire checking account balance, now over $95,000, offset against the notes. Several outstanding checks were dishonored. Bankcom quickly issued a press release disclosing the actions taken by Continental and affirming the stability of Bankcom's financial position.
On February 28, 1978, six days after the offset, Bankcom filed a two-count complaint against Continental and Goy, alleging that (1) Continental was promissorily estopped to collect on the notes by offsetting Bankcom's checking account on February 22, and (2) Continental's actions constituted tortious interference with Bankcom's business relationships. At the same time, Continental filed a counterclaim for $154,041.75, the balance remaining on the notes after the setoff. After engaging in extensive discovery, Bankcom amended its complaint, adding two more counts: (3) Goy fraudulently induced Fish to submit deposits to the checking account for the purpose of building up the balance in anticipation of the offset, not to pay outstanding checks; and (4) Continental breached its fiduciary duty to Bankcom in connection with its handling of the two notes, the negotiations, and the offset.
After granting motions to extend the period for discovery, reviewing the extensive legal memoranda, documents, depositions and affidavits, and hearing lengthy oral arguments, the trial court entered summary judgment in favor of Continental on all four counts of Bankcom's complaint and on that portion of Continental's counterclaim seeking recovery on the two promissory notes. For the reasons discussed below, the decision of the trial court is affirmed in part and reversed in part.

OPINION
The right to disposition of litigation by summary judgment is governed by statute. Section 57(3) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 57(3)) provides that summary judgment is appropriate "* * * if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the trial court must construe the pleadings, depositions, and affidavits most strictly against the moving party and most liberally in favor of the opponent. Dakovitz v. Arrow Road Construction Co. (1975), 26 Ill. App.3d 56, 324 N.E.2d 444.
*497 "It must be clearly understood, however, that the summary judgment procedure may not be used to try any issue." (Manahan v. Daily News-Tribune (1977), 50 Ill. App.3d 9, 12, 365 N.E.2d 1045, 1047.) While "[i]t has been suggested that the judge in deciding a motion for summary judgment may not draw inferences," we "do not believe that this is an exclusive statement. If the court is presented with facts with which reasonable men may disagree or facts which are subject to conflicting inferences, summary judgment should not be granted." (50 Ill. App.3d 9, 12, 365 N.E.2d 1045, 1048.) "Even if there is no dispute in the evidence, if fair-minded persons would draw different conclusions from the evidence, then it becomes the province of the jury to draw that conclusion which to them seems most reasonable." (Silberstein v. Peoria Town & Country Bowl, Inc. (1970), 120 Ill. App.2d 290, 293-94, 257 N.E.2d 12, 14.) After reviewing the entire record, we find that conflicting inferences may be drawn from the undisputed facts presented by both Bankcom and Continental, and therefore the entry of summary judgment was in part improper.

I
 1 Bankcom's first claim, that Continental was promissorily estopped to collect on the notes by offsetting Bankcom's checking account against the debt, is based on the "well settled principle of law that where parties to a written contract mutually consent and acquiesce in the oral modifications and in the non-performance of certain provisions thereof * * * each party is estopped to deny the efficacy of the modifying agreement * * * provided the proof is strong that such * * * modifications have been assented to." (Nagle v. General Merchandising Corp. (1978), 58 Ill. App.3d 344, 348, 374 N.E.2d 1137, 1141, quoting Robar v. Isham (1924), 310 Ill. 585, 589, 142 N.E. 460, 462.) While we agree with Continental that Goy had never expressly promised in writing to refrain from collecting on the notes by offsetting Bankcom's checking account, the promise essential to a claim of promissory estoppel need not be expressed, only unambiguous. (See Perlin v. Board of Education (1980), 86 Ill. App.3d 108, 407 N.E.2d 792.) "In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. * * * The intention of the parties must in some way be communicated, since a person's intention can be ascertained by another only by means of outward expressions such as words and acts." (Bank of Marion v. Robert "Chick" Fritz, Inc. (1973), 9 Ill. App.3d 102, 108, 291 N.E.2d 836, 840, aff'd (1974), 57 Ill.2d 120, 311 N.E.2d 138.) Bankcom alleges that the setoff was improper because while the outward *498 expressions of intent by both parties established that the parties were working toward a modified agreement, Continental's action was based solely on its uncommunicated intent.
Bankcom's claim of promissory estoppel is based on several communications among Goy, Weiss, and Fish. A review of the language used in the letters exchanged by the three men reveals that in nearly every case, phrases acknowledging the maturity date of the notes were closely followed by phrases inviting renegotiation. On October 26, 1977, an outstanding loan from Continental to Bankcom was renewed; the language in the letter accompanying the renewal note indicated that automatic renewal was almost a matter of course. A November 30, 1977, letter from Goy to Fish firmly restated the maturity date of the October note but went on to say, "While of course we would be willing to discuss a renegotiation of that note at any time * * *." Two days later, Fish replied that Bankcom "would like to avail [itself] of your suggestion about renegotiation * * *." Goy's February 14, 1978, letter to Fish, repeatedly quoted by Continental, began with the bank's assertion, "As discussed with you and other members of the Board of Bank Computer Network Corporation, this Bank has indicated our desire to be paid out of our advances to your firm at their January 30, 1978 and February 13, 1978 maturities." However, the letter then continued with several paragraphs explaining in detail Continental's proposals for future borrowing relations with Bankcom and a suggested alternative plan for repayment of the notes.
Even after the February 6 oral agreement was changed into the February 14 written proposals explained above, Goy's repetition of those three options to Weiss on February 21 logically implied that Weiss still had a choice among them; immediate, unilateral action to collect on the notes by offset of Bankcom's checking account was not a fourth alternative Weiss had to consider. It is clear to us that the third option, proposing interim financing by Continental while Bankcom moved to another bank, contemplated repayment with funds from the new loan, not from the checking account. Like the documents implying a 12-month employment contract in Perlin v. Board of Education (1980), 86 Ill. App.3d 108, 407 N.E.2d 792, Goy's letter to Fish and telephone call to Weiss presented a limited number of options, one of which was a specific method of repayment. Until Bankcom had had a reasonable time to accept and act on the third option, that of paying Continental with a loan from another bank, Continental was estopped to collect on its notes by offsetting Bankcom's checking account.
On the basis of the above evidence, it is reasonable to conclude *499 that the failure of Continental to make any effort to collect on the October note at its January 30, 1978, maturity date resulted from the ongoing negotiations concerning renewal. Although Goy had stated specifically that any promise of future extensions or advances to Bankcom would not be effective unless put in writing, Bankcom reasonably believed that the stipulated February 6 oral agreement would be memorialized in writing. When the subsequent handwritten proposal altered some of the terms previously agreed upon, Bankcom again reasonably believed that it had time to discuss and internally deal with the new terms.
While it is true that there was not a "meeting of the minds" between Bankcom and Continental on every facet of Continental's proposal, the only differences centered around the terms Continental had unilaterally altered. Continental overstates the level of disagreement by saying, "As of February 14, there was no meeting of the minds between Continental and Bankcom and no agreement between them as to how a continuing relationship would be structured." We find that, on the facts presented, Bankcom arguably could have believed that the portions of the oral agreement not contravened were still in effect, and that Continental thus promised to forego collection until negotiations ceased. Goy's language warning that the letter "should not be interpreted as a proposal by the Bank to advance funds on the basis as indicated" occurs in the midst of three alternative options, one of which was a proposed repayment plan. In such a context, the "disclaimer" is neither the unequivocal repudiation of the oral agreement nor the express reminder that the bank expected prompt payment on the already-expired maturity dates that Continental would have us believe. On these facts, reasonable men certainly could draw different but equally reasonable inferences concerning the existence of a definite promise.
In addition to establishing a question of fact on the promise itself, Bankcom has also made it clear that it relied on the proposal. Fish was already engaged in negotiations with several other financial institutions, and at least one of Bankcom's directors stood ready and able to advance personal funds to pay Continental. Further, Continental anticipated Bankcom's reliance; the detailed requirements of personal guarantees, collateralization of guarantees, letters of credit, and life insurance protection for Fish were not a mere exercise in creative security. Finally, Bankcom has produced some evidence of both financial and reputation damage, thus satisfying all requirements for a claim of promissory estoppel.
 2 It appears clear from the record before us that Bankcom has *500 presented evidence capable of being interpreted as establishing promissory estoppel. "Whether or not these factors are all present is a question of fact to be determined by the trial court [i.e., the jury]." (Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co. (1980), 90 Ill. App.3d 768, 770, 413 N.E.2d 209, 211.) We therefore reverse the entry of summary judgment on Bankcom's claim of promissory estoppel and remand this issue for trial on the merits.

II
Bankcom's second claim alleges that Continental's offset of the checking account and dishonor of several of Bankcom's checks constituted tortious interference with its business relations. Actions for interference with prospective economic advantage arising out of a business relationship are recognized in Illinois and require that (1) the plaintiff has a valid business expectancy; (2) the defendant knows of the expectancy; (3) the defendant intentionally interferes and prevents the realization of the business relationship; and (4) the defendant's interference actually damages the plaintiff. (Thorne v. Elmore (1979), 79 Ill. App.3d 333, 398 N.E.2d 837.) The trial court held that Bankcom had not demonstrated a cause of action under the law because Continental's offset was a privileged action taken to protect its own present, existing economic interest. (See Comment, Automatic Extinction of Cross-Demands: "Compensatio" from Rome to California, 53 Cal. L. Rev. 224 (1965).) As noted by Continental, "[O]ne who has an interest may take action to protect his rights, and even if the interference is done with malice he cannot be held financially liable for the result of his actions." Petit v. Cuneo (1937), 290 Ill. App. 16, 22, 7 N.E.2d 774, 777.
Bankcom counters the trial court's holding by asserting that once it has established a prima facie case of intentional interference and resulting damage, Continental cannot merely claim that the setoff was privileged and thereby avoid liability; if Continental was promissorily estopped to collect on the notes, it had no privilege to offset Bankcom's account. Once the setoff is no longer privileged, it becomes wrongful, malicious, and actionable. "The term `malice' in this regard is not used in its popular sense of ill will or hatred, but in its legal sense as an intent to do wrongful harm and injury and without just cause." (Candalaus Chicago, Inc. v. Evans Mill Supply Co. (1977), 51 Ill. App.3d 38, 47, 366 N.E.2d 319, 326.) At the very least, Bankcom argues, the possibility that estoppel has transformed an otherwise privileged setoff into tortious interference with a business expectancy means that a genuine issue of material fact exists, thus rendering *501 summary judgment inappropriate.
 3 Our careful analysis of the relevant case law leads us to conclude that Bankcom has failed to meet its burden of presenting some evidence that Continental's intent was to interfere with Bankcom's business relations. No authority demonstrates that "intended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means has been held to be actionable." (Prosser, Law of Torts sec. 130, at 952 (4th ed. 1971).) Even if the means were not proper, they do not approach the level of legal malice. We therefore conclude that the interference is more appropriately labeled "incidental" rather than "intentional." Accordingly, we affirm the trial court's entry of summary judgment in favor of Continental on Bankcom's claim of tortious interference with business relations.

III
Bankcom's third claim alleges that Continental's failure to inform Bankcom that it intended to offset Bankcom's checking account constitutes a fraudulent misrepresentation. The elements of an action for fraud, set forth in Zeilenga v. Stelle Industries, Inc. (1977), 52 Ill. App.3d 753, 757, 367 N.E.2d 1347, 1349, are as follows:
"In order to prove actual fraud it is incumbent upon plaintiff to establish that defendants' misrepresentation was an untrue statement of material fact, made with knowledge of its falsity for the purpose of influencing the other party who relied upon the statement."
We note that in most jurisdictions, a promise of future conduct, representing as it does the state of a person's mind, is regarded as a statement of material fact; consequently, "a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit * * *." (Prosser, Law of Torts sec. 109, at 729 (4th ed. 1971).) Illinois courts, however, have rejected this general rule, holding instead that "a promise to perform an act accompanied by an intention not to perform [is] not a false representation upon which a fraud charge could ordinarily be based * * *." (Vance Pearson, Inc. v. Alexander (1980), 86 Ill. App.3d 1105, 1111, 408 N.E.2d 782, 786.) Only one recognized exception has developed: a knowingly false promise of future conduct that amounts to a scheme to defraud. Steinberg v. Chicago Medical School (1977), 69 Ill.2d 320, 371 N.E.2d 634; Roda v. Berko (1948), 401 Ill. 335, 81 N.E.2d 912.
Our examination of the documents that were before the trial court convinces us that Goy's response "Fine" to Fish's assurance that deposits *502 sufficient to cover the overdraft were in the mail does not amount to actionable fraud. Although Bankcom argues that Goy's response was an implied promise of future conduct, i.e., that the deposits would be used to pay Bankcom's outstanding checks, not offset against the outstanding debt, it is clear to us that Goy's reply was not part of a general scheme to defraud Bankcom. "As a general principle of law, courts have been consistent in holding that fraud is always a positive and willful device, resorted to with the intent to injure another in some manner." (People v. L & M Liquors, Inc. (1976), 37 Ill. App.3d 117, 121-22, 345 N.E.2d 817, 821.) Illinois case law, however, generally utilizes a more inclusive definition, that fraud includes anything calculated to deceive. (See Citizens Savings & Loan Association v. Fischer (1966), 67 Ill. App.2d 315, 214 N.E.2d 612.) Using either definition, Bankcom did not provide any evidence that Goy had the requisite calculated intent to deceive, much less harm Bankcom. Indeed, Fish admitted that had Goy informed him of Continental's intention to offset, Bankcom would have stopped writing checks, stopped payment on its outstanding checks, delayed further deposits, and personally explained the dishonor of its checks to its payees.
A moment's reflection makes it clear that none of Bankcom's proposed responses would have conserved any of the offset funds by removing them from Continental's grasp. Further, Goy's word "Fine," if interpreted to mean that Continental would permit Bankcom to overdraw its account, would amount to the gift of a loan without advance request because honoring an overdraft amounts to granting an unsolicited loan. Such an executory gift is unenforceable. Carson v. Carson (1912), 256 Ill. 381, 100 N.E. 263.
 4 On the basis of the above analysis, we conclude that Bankcom did not present sufficient facts to establish a claim of actual fraud; in addition, the alleged representation of future conduct was neither a scheme of action to defraud nor an enforceable promise of a "gift," an unsolicited loan. Consequently, because no material issue of fact was raised, we affirm the trial court's entry of summary judgment on Bankcom's claim of fraud.

IV
Bankcom's fourth allegation is that Continental breached its fiduciary duty of "fairness, loyalty, and full disclosure" to Bankcom. While acknowledging that the debtor-creditor relationship between the two parties created no fiduciary duty as a matter of law (McErlean v. Union National Bank (1980), 90 Ill. App.3d 1141, 414 N.E.2d 128; People ex rel. Barrett v. Liberty State Bank (1940), 304 Ill. App. 238, *503 26 N.E. 2d 156), Bankcom argues that the "relationship extended significantly beyond that of debtor-creditor." As the trial court properly recognized, Bankcom's contention that it gave Continental confidential information and placed trust and confidence in its lender does not satisfy the requirements for the creation of a fiduciary duty.
As noted by Continental, Illinois law establishes that where a fiduciary relationship does not arise as a matter of law, it may exist "only when confidence is reposed on one side and there is resulting superiority and influence on the other side. It is not sufficient that confidence be reposed by one party, * * * [it] must be actually accepted by the other * * *." (People ex rel. Barrett v. Central Republic Trust Co. (1939), 300 Ill. App. 297, 303, 20 N.E.2d 999, 1002.) Although Fish asserted that he had trust and confidence in Continental and its loan officers, he did not establish that Continental gained any influence and superiority over him. Similarly, there was no evidence that Continental accepted the trust and confidence allegedly extended by Bankcom.
 5 A fiduciary duty is created only when one party entrusts himself to the "domination and control" of another. (300 Ill. App. 297, 303, 20 N.E.2d 999, 1002.) The documents, memoranda, and depositions all establish that not only did Bankcom exercise independent judgment in the control of its business, but also the information Bankcom gave to Continental, although confidential, included only such information as is typically supplied to a creditor to aid in evaluating the credit potential of a prospective borrower. The trial court properly concluded that these facts did not establish the existence of a fiduciary relationship between the parties, and therefore we affirm the entry of summary judgment on this issue.

V
 6 Finally, Bankcom claims that Continental is not entitled to summary judgment on its counterclaim because collection on the notes is precluded by Bankcom's promissory estoppel claim. In light of our decision to reverse the entry of summary judgment on the issue of promissory estoppel, it follows that the extent of Bankcom's liability on the notes cannot be made certain until the issue of Continental's potential liability on the alleged promise is resolved. As explained in Chicago Title & Trust Co. v. Exchange National Bank (1974), 19 Ill. App.3d 565, 567, 312 N.E.2d 11, 14, "no default * * * would permit the mortgagor to accelerate the maturity of the debt when there is a setoff available which is equal to or exceeds the amount of the indebtedness due at the time of default." Likewise, the fact that Bankcom's *504 loan from Continental was overdue does not preclude Bankcom from raising a legitimate claim of improper setoff. While Continental is not accelerating the original maturity date on the notes, the claim of promissory estoppel, if proven, may establish that the maturity dates had been extended. If so, Continental would be accelerating the maturity of the debt improperly. Accordingly, we reverse the entry of summary judgment on Continental's counterclaim.
Affirmed in part; reversed in part; remanded for further proceedings in accordance with this decision.
JOHNSON, P.J., and ROMITI, J., concur.