CURT BULLOCK BUILDERS, INC., Plaintiff-Appellee and Cross-Appellant, v. H.S.S. DEVELOPMENT, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

Fourth District   No. 4—91—0148

Opinion filed January 16, 1992.—Rehearing denied March 12, 1992.

LUND, J., specially concurring.

Mark S. Goodwin, Robert C. Hofmann, and Thomas M. Goodwin, all of Dougherty, Hofmann & Goodwin, P.C., of Danville, for appellants.

Kennith W. Blan, Jr., of Blan Law Offices, of Danville, for appellee.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

On August 3, 1988, plaintiff Curt Bullock Builders, Inc., filed suit in the circuit court of Vermilion County against defendants H.S.S. Development, Inc., Peoria Associates, an Illinois limited partnership, Herbert S. Saywitz, Theodore Sayers, Mark Sayers, and the La Salle National Bank, seeking relief concerning alleged injuries to plaintiff's leasehold rights and interference with its business relationships. On August 1, 1989, plaintiff filed a third-amended complaint, upon which the parties went to trial. Count I alleged tortious interference with plaintiff's business relationships; count II sought punitive damages for that tort; and count III sought damages for an alleged breach of covenant in a lease granted plaintiff by various defendants. On October 18, 1990, prior to trial, the court denied defendants' motion for summary judgment as to count III.

The case was tried before a jury. Prior to verdict, the cause was dismissed as to La Salle National Bank. The court directed a verdict for defendants as to count II seeking punitive damages. On October 30, 1990, the court entered judgments on a jury verdict finding for

plaintiff as to counts I and III and fixing damages in the sum of $241,120. The remaining defendants have appealed the judgments on the verdict fixing damages, and plaintiff has cross-appealed the judgment on the directed verdict. Defendants contend (1) the proof of liability and damages was insufficient to support the verdict; (2) the venue was improper; (3) it was entitled to a summary judgment as to count III; and (4) the court erred in ruling on evidence and instructing the jury. On cross-appeal, plaintiff asserts the court erred in directing a verdict against it as to count II.

We affirm the judgments of liability in favor of plaintiff and against defendants as to counts I and III. We also affirm the judgment on count II. We reverse the damages award in regard to counts I and III, and remand for a new trial on those counts as to the amount of damages to be awarded.

Plaintiff is a corporation which builds and sells garages. From 1974 to 1984, plaintiff leased from Delores Maloof a rectangular lot 80 feet by 40 feet on land west of University Avenue in Peoria, and conducted sales from a building on that land. In 1984, plaintiff did not renew that lease but rented a nearby tract which was located approximately 100 feet north and west of the former leasehold. This tract was owned by the Mitchell Maloof trust, which was represented by the same real estate agency as was plaintiff's former landlord. Plaintiff's claim for breach of covenant arises from paragraph 5 of the latter lease, which contained the exact same language as paragraph 5 of the lease with Delores Maloof. Those paragraphs stated:

"It is further agreed that the tenant and its representatives, business invitees, etc., shall be entitled to use either of the 18-foot roadway easements reserved across the tract lying between the demised premises and University Avenue as a means of access to University Avenue for the benefit of the demised premises. The landlord hereby reserves a right-of-way over and along a strip of the demised premises over and along the northerly 18 feet of the premises and lower and along the southerly 18-feet of the premises even depth for the benefit of the tract lying to the west of the premises."

During the entire time of the 1974-1984 lease, a lot described by the parties as the "Bonanza tract" (because a "Bonanza" restaurant was located thereon) separated the property leased by plaintiff from University Avenue. The described 18-foot strips were on the Bonanza tract. That purportedly servient tract was not owned by the lessor. The 1984 leasehold was on land which was part of a larger tract called the "Burlington Coat Factory" parcel, upon which a large

building formerly used as a factory was located. Direct access from plaintiff's 1984 leasehold to University Avenue existed only by going through the tract leased from 1974 to 1984, and then through the "Bonanza tract." At the time of the 1984 lease, the lessor owned neither of the tracts necessary for access to University Avenue. Thus, the purported grantor of the 1984 easement had no interest to which the purported easement could attach. However, until sometime in August 1988, plaintiff and its customers used the purported easements over the two tracts without objection from anyone.

Defendants H.S.S. Development, Inc., and the Sayerses formed a limited partnership called Peoria Associates. Defendant Saywitz was the sole shareholder of H.S.S. Development, Inc. Prior to 1987, Saywitz had owned nearby land. Gradually, Peoria Associates or its members acquired other tracts in the area for the purpose of developing a shopping center. They acquired the land upon which plaintiff's 1984 leasehold was situated and took an assignment of the lease to plaintiff, whereupon plaintiff began paying rent to Peoria Associates. They then acquired the two tracts over which the purported easement to University Avenue existed. On August 11, 1988, Peoria Associates sent plaintiff a notice to quit the premises, alleging plaintiff had breached their lease by failing to maintain liability insurance and to pay real estate taxes as provided by plaintiff's lease, and a suit in forcible entry and detainer was brought by Peoria Associates against plaintiff in the circuit court of Peoria County. That suit was voluntarily dismissed on August 31, 1988, but reinstated on March 16, 1989, and then stayed pending disposition of the instant case.

The evidence is undisputed that Saywitz and plaintiff's president, Randy Bullock, met at plaintiff's Danville office. According to Bullock, defendants were anxious to acquire plaintiff's leasehold so that the premises would be free for the development of a shopping center. He testified that Saywitz informed him that plaintiff's operation did not fit the style of the shopping center but Saywitz would obtain a nearby leasehold for plaintiff's operation. Bullock further testified that when the parties were unable to agree, Saywitz again maintained plaintiff was in default on its lease and also stated there was "more than one way to skin a cat."

Undisputably, at least by late August 1988, Peoria Associates had begun construction for the proposed shopping center. According to plaintiff's witness Gary Huggins, the asphalt which covered plaintiff's ingress and egress to and from University Avenue was torn up by August 1, 1988, and this prevented customer use of that access to plaintiff's place of business. Also during the construction, Peoria Associ-

ates erected a facade along various parts of the shopping center. This facade ran along the south edge of plaintiff's leasehold, obscuring the two buildings plaintiff had erected there. A gate in the facade did permit access through the facade to plaintiff's building. Plaintiff put on considerable evidence to show a reduction in its business after the construction began. The parties agree that plaintiff had other access to University Avenue but this access was clearly more circuitous.

Plaintiff's clearest right to recover arises from count III, which alleged a breach of a covenant of the lease. The questions involved, other than as to damages, are entirely those of law. Defendants maintain the circuit court erred in denying their motion for summary judgment. However, as the same exact issue as that raised on the motion for summary judgment was decided at trial, that issue is merged in the judgment on the verdict; and on review, we determine the propriety of the judgment on the verdict and not the order denying summary judgment. *In re Marriage of Adams* (1988), 174 Ill. App. 3d 595, 528 N.E.2d 1075, *rev'd on other grounds* (1990), 133 Ill. 2d 437, 551 N.E.2d 635; *International Association of Machinists & Aerospace Workers, District Lodge No. 140 v. Cheshire/A Xerox Co.* (1984), 125 Ill. App. 3d 350, 465 N.E.2d 981.

■ As we have indicated, when the 1984 lease was executed, the then lessor had no interest in the two tracts over which the covenant of paragraph 5 of the lease purported to create an easement. Thus, no easement was created by that instrument at that time. However, the covenant of paragraph 5 was one which was intended to be a covenant real, or one which would run with the land:

> "The test whether a covenant runs with the land or is merely personal is whether the covenant concerns the thing granted and the occupation or enjoyment of it, or is a collateral and personal covenant not immediately concerning the thing granted. If the covenant concerns the land and the enjoyment of it, its benefit or obligation passes with the ownership, but to have that effect the covenant must respect the thing granted or demised and the act to be done or permitted must concern the land or estate conveyed." (*Purvis v. Shuman* (1916), 273 Ill. 286, 294-95, 112 N.E. 679, 682.)

Covenants which "run with the land may be transferred and assigned, so as *to vest the liability*, as well as the benefits, in an assignee." (Emphasis added.) 20 Am. Jur. 2d *Covenants, Conditions, and Restrictions* §25, at 594-95 (1965); see also *Purvis*, 273 Ill. at 294-95, 112 N.E. at 682.

Peoria Associates eventually became an assignee of the 1984 lease, paragraph 5 of which stated that plaintiff, "its representatives, business invitees, etc., shall be entitled to use" certain easements therein described. When Peoria Associates then acquired the property stated by paragraph 5 to be subject to the easement described, Peoria Associates was then bound to comply with the covenant of the lease requiring that plaintiff be allowed the ingress and egress set forth.

Analyzing the situation here under a slightly different approach, we conclude the evidence supported a determination that Peoria Associates was estopped to deny the existence of the easement described in the lease. The elements necessary to be under the doctrine of estoppel are "some representation or conduct on the person sought to be estopped, reliance by another, and prejudice or injustice to that person." (*Steel City National Bank v. J.J. Wright Oldsmobile, Inc.* (1989), 192 Ill. App. 3d 926, 932, 549 N.E.2d 726, 729.) In *Steel City National Bank,* the appellate court affirmed the finding of the circuit court that plaintiff was equitably estopped from denying the validity of the lease. The court noted that allowing plaintiff to claim the invalidity of the lease where it had accepted rent under the lease for five years, and its predecessor had done so for eight years, would have a fraudulent and unjust effect.

■ Here, the acceptance of the assignment of the lease containing the covenant of paragraph 5 constituted the necessary representation by Peoria Associates. The evidence is undisputed that plaintiff was using the purported easement and apparently believed it had a right to do so because of paragraph 5. Peoria Associates is bound to know of the existence of paragraph 5, and the evidence indicated Peoria Associates knew plaintiff had been using the purported easement. Peoria Associates accepted the benefits of the lease in the form of rental payments by plaintiff. The situation here is also somewhat analogous to that in *Lake Shore Management Co. v. Blum* (1968), 92 Ill. App. 2d 47, 52, 235 N.E.2d 366, 369, where lessees who had taken possession and paid rent under a lease were held estopped to question the validity of the lease. Plaintiff was prejudiced because the asphalt in the area described in paragraph 5 was torn up. That access to plaintiff's place of business was blocked for an extended period of time.

At the conclusion of the presentation of the evidence, the circuit court permitted plaintiff to amend its pleadings to set forth the theory of estoppel. Then, without objection by defendants, the court instructed the jury in this respect. The evidence supported these rulings and the court proceeded properly.

**16**

■ We now turn to the question of the sufficiency of the evidence to prove defendants guilty of the tort of improper interference with a business relationship. This court has described the elements of that tort as (1) "a reasonable expectation [by the plaintiff] of entering into a valid business relationship" with another, (2) knowledge of the expectancy by the defendant, (3) intentional and malicious interference "with the expectancy," and (4) injury to the plaintiff. (*Kruger v. Menard Electric Cooperative* (1988), 169 Ill. App. 3d 861, 865, 523 N.E.2d 708, 710.) In *Kruger*, we upheld the dismissal of a count of a complaint purporting to allege that tort for the failure of that count to allege malice. See also *Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.* (1983), 120 Ill. App. 3d 254, 258-59, 458 N.E.2d 115, 120.

To the extent that a party acts to enhance its own business interests, it has a privilege to act in a way that may harm the business expectancy of others and that privilege is greater, where, as here, no contract exists between the plaintiff and the entity with which the business relationship is anticipated. (*Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 413 N.E.2d 98; W. Keeton, Prosser & Keeton on Torts §130, at 1011 (5th ed. 1984).) If the interference which results is of an incidental nature rather than an intentional nature, no tort occurs. *Bank Computer Network Corp. v. Continental Illinois National Bank & Trust Co.* (1982), 110 Ill. App. 3d 492, 501, 442 N.E.2d 586, 593; *Belden Corp.*, 90 Ill. App. 3d 547, 413 N.E.2d 98.

Plaintiff presented substantial evidence here that it had customers making purchases from its facility by use of the purported easement to University Avenue and that they wished to keep those customers. As we will explain, evidence was also presented showing plaintiff lost considerable business after construction of the shopping center was started and use of the purported easement was prevented by the construction. Evidence also showed that the facade shielded the view of plaintiff's establishment from University Avenue.

The major thrust of plaintiff's proof of intent to harm and malice was the testimony of Randy Bullock that when he met with Saywitz, a partner in Peoria Associates, Saywitz stated there was "more than one way to skin a cat." This statement was made after Bullock had refused offers by Saywitz in regard to relocation of plaintiff's place of business. According to Bullock, Saywitz had stated that plaintiff's business was not appropriate for the shopping center. Further evidence bearing upon malice by defendants concerned a suit in forcible entry and detainer which Peoria Associates brought against plaintiff

in the circuit court of Peoria County during the time when defendants were trying to persuade plaintiff to relocate its business. The claimed breaches of the lease by plaintiff consisted of failure to pay $470 of real estate taxes at a time when plaintiff was not usually required to make such payment and failure to obtain for Peoria Associates a certificate showing it was an additional insured on plaintiff's public liability policy.

We agree with the circuit court that the foregoing evidence of malice was, at least, barely enough to submit to the jury count I, charging tortious interference with plaintiff's business relationship. The allegations of that count and count II, seeking punitive damages, were almost the same and malice was an essential element of the request for punitive damages. However, we conclude the circuit court acted properly in refusing to submit count II to the jury. In its explanation of that ruling, the court indicated it found analogy between the situation here and that in *Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157, a case involving intentional infliction of emotional distress. Plaintiff maintains that comparison was improper. We need not pass upon that question because the court's comments indicate the reason for the court's decision was that it did not "think the evidence [there showed] the level of maliciousness that would support a claim for punitive damages."

The Illinois Supreme Court has consistently stated that punitive damages are not favored in the law. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267; *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) It has also stated that the trial court has some discretion in determining whether to allow punitive damages to be imposed. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401; *Eshelman v. Rawalt* (1921), 298 Ill. 192, 197, 131 N.E. 675, 677-78.) The conduct of defendants, even when viewed most favorably to plaintiff, was not highly malicious. The circuit court did not abuse its discretion or act contrary to the law in directing a verdict on count II.

The damages arising from counts I and III were the same, as they arose from the lack of access for customers when the entrance to plaintiff's place of business from University Avenue was blocked during construction. Evidence was presented that sales dropped substantially after construction was started in 1988 and were even lower in 1989. Randy Bullock testified that, in his opinion, plaintiff lost sales of 40 garages in 1988 due to the impediments to access. He based this opinion on the facts that (1) Huggins, a salesman who had a history of improving sales, was working in the Peoria store; (2) ordinarily they

sold 30% of the yearly total in the first two quarters; (3) in 1988, they sold 31 garages in the first two quarters but sold only 29 in the last two quarters; (4) by the usual percentage comparisons between the two halves of the year, 70 garages would have been sold in the last half of the year.

Bullock also testified that on the basis of 100 sales in 1988, they would have sold 113 in 1989 because plaintiff's Bloomington store had a 13% increase in sales from 1988 to 1989. As plaintiff only sold 46 garages from its Peoria store in 1988, plaintiff expressed an opinion that 67 sales were lost that year as a result of the lost access. Bullock then maintained that from studies he had seen, each two garage sales generate an additional sale in future years. Thus, Bullock contended that, in addition to the 107 sales which he maintained were lost in 1988 and 1989, plaintiff lost an additional 53 sales in subsequent years, thus totalling a loss of 160 sales of garages.

Michael Fox, a certified public accountant employed by plaintiff, testified that the average net profit per garage was the sum of $1,507. When the figure of $1,507 is multiplied by 160, Bullock's projected number of lost sales, the sum of $241,120 is obtained. This was the exact amount of the verdict. The procedure used here by Fox and accepted by the jury for determination of damages is inherently very speculative. However, in *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323, the supreme court passed upon the sufficiency of proof of lost profits incurred by theater owners resulting from a common law nuisance. The evidence showed the theater had receipts of as high as $69,328.65 in 1959 and had declined to $44,557 in 1967, a period of time when the evidence indicated theater attendance nationwide was on the increase. The court upheld an award of $15,000, stating:

> " 'It is perhaps true that absolute certainty as to the amount of loss or damage in such cases [involving lost profits] is unattainable, but that is not required to justify a recovery. All the law requires is that it be approximated by competent proof. That proof of the exact amount of loss is impossible will not justify refusing compensation. If that were the law, contracts of the kind here involved could be violated with impunity. All the law requires in cases of this character is that the evidence shall with a fair degree of probability tend to establish a basis for the assessment of damages.' " *Schatz*, 51 Ill. 2d at 147-48, 281 N.E.2d at 325-26, quoting *Barnett v. Caldwell Furniture Co.* (1917), 277 Ill. 286, 289, 115 N.E. 389, 390.

In *Schatz*, the trial court had not, as here, given the plaintiff full benefit of the projection of damages which arose from the figures presented in evidence. Nevertheless, testimony by Bullock, if believed by the jury, did "with a fair degree of probability tend to establish a basis for the assessment of damages." Although we are remanding for a new trial as to damages, we hold the evidence was sufficient to support an award of substantial damages.

Having passed upon the sufficiency of the evidence, we now confront the questions concerning possible error which might require retrial. Defendants place greatest emphasis upon their theory that the case should not have been tried in Vermilion County. They contend that under both the statutory provision for venue under section 2—101(2) of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 2—101(2)) and under the doctrine of *forum non conveniens*, the place of trial was improper.

■ Section 2—101 of the Code, upon the basis of which the circuit court ruled that Vermilion County was a proper venue, states: "[e]xcept as otherwise provided in this Act, every action must be commenced (1) *** or (2) in the county in which the transaction *or some part thereof occurred out of which the cause of action arose.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110, par. 2—101.) The italicized language has been interpreted to "include [counties] where any significant negotiations were carried on between the parties, [or] *where an agreement was signed.*" (Emphasis added.) (*People ex rel. Carpentier v. Lange* (1956), 8 Ill. 2d 437, 441, 134 N.E.2d 266, 267-68.) Here, the lease of the premises out of which plaintiff's claim for breach of covenant for easement arises was signed on behalf of plaintiff in Vermilion County. Statutory venue was established.

■ The doctrine of *forum non conveniens* is not so precisely defined as is statutory venue. The plaintiff's statutory right to select the forum is given great deference and will not often be defeated. (*Griffith v. Mitsubishi Aircraft International, Inc.* (1990), 136 Ill. 2d 101, 106, 554 N.E.2d 209, 211.) Here, the alternative would have been to try the case in Peoria County but none of the parties, plaintiff or defendants, are residents there. No indication was given that a jury view of the premises would have been necessary or desirable. No preponderance of the witnesses were from there. Accordingly, the trial court properly gave deference to plaintiff's statutorily correct selection of Vermilion County as the venue and properly denied all requests to change the place of trial.

■ Prior to trial, defendants filed a motion *in limine* which sought to preclude plaintiff from offering in evidence "the sales his-

tory or records of other business locations of plaintiff" and the motion was denied. Over objection, plaintiff was permitted to introduce Randy Bullock's testimony of the sales of plaintiff's Bloomington facility. We recognize and are concerned about the conjectural nature of the applicability of that evidence to the Peoria facility. However, that sales history does seem to be a factor which logically would be entitled to some weight in making a projection of plaintiff's likely profits at Peoria. The standards set forth in *Schatz* seem to give some credence to such information.

Defendants rely upon *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.* (1986), 143 Ill. App. 3d 168, 491 N.E.2d 912, and *Favar v. Riverview Park* (1908), 144 Ill. App. 86, in contending the evidence should not have been admitted. Those cases do not concern the admissibility of the type of evidence involved here. Rather they concern whether such evidence is, of itself, sufficient to prove damages. The trial court has some discretion in ruling on the relevancy of evidence. We find no reversible error resulted from the admission of this evidence.

■ Defendants filed a second *in limine* motion requesting plaintiff be barred from offering testimony or evidence through its disclosed experts which varied from the evidence elicited in this connection through discovery. Supreme Court Rule 220(d) (134 Ill. 2d R. 220(d)) prohibits a disclosed expert from giving testimony inconsistent with that set forth in the discovery furnished by the party calling the expert. The motion was never ruled upon. However, during defendants' cross-examination of Randy Bullock, he testified that sales figures for 1987 through 1989 for plaintiff's Springfield operation were not accurately represented on a defendants' exhibit. Over objection, on redirect examination, Randy Bullock testified as to the accurate figures. Defendants contend error resulted because the procedure indicated to the jury that defendants had given inaccurate figures to the jury when those inaccurate figures had actually been supplied by plaintiff.

Any error which occurred would result from the ruling on the objection to the testimony rather than from the lack of ruling on the *in limine* motion. The court did overrule the objection and the witness then explained the nature of the mistake. Although the explanation did not remove a possible inference that the defendants had originated the error, any prejudice to defendants was exceedingly minor. No error occurred.

Defendants also assert the court erred in denying their motion *in limine* to prohibit Randy Bullock from testifying as an expert.

Supreme Court Rule 220(a)(1) provides in pertinent part as follows:

"An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation ***." 134 Ill. 2d R. 220(a)(1).

During trial Bullock testified as follows: (1) his educational background was at the University of Illinois; (2) he has been employed by Bullock Builders since 1972; (3) in high school and college he was a laborer building garages, then he advanced to salesman in the Chicago area and in Ohio; he then became a division manager and a vice-president for a number of years, and eventually he became president of Bullock in 1984; (3) he has extensive experience concerning the sales history of the company; (4) it is his responsibility to review sales histories; (5) he has been making sales projections each year since 1984; (6) when making sales projections he primarily considers the sales history of the individual district office, along with that of the individual salesmen; and (7) he has made sales projections for the Peoria office since 1984. In a proper case, an expert can be qualified merely by experience. (*Duffy v. Midlothian Country Club* (1985), 135 Ill. App. 3d 429, 481 N.E.2d 1037.) The sufficiency of the proof to qualify a witness as an expert rests largely in the sound discretion of the trial court. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §702.2, at 494-95 (5th ed. 1990).) That discretion was not breached in allowing receipt of this evidence.

Randy Bullock also testified to an opinion that every two sales lost by Bullock in 1988 and 1989 would cause the loss of one additional sale in subsequent years. He then explained that in calculating the total number of sales he deemed lost, he increased the number of lost sales projected for 1988 and 1989 by 50%. Plaintiff's counsel then asked Randy Bullock how he arrived at the 50% formula and Randy Bullock responded: "We've had surveys in the past. We've—just general knowledge." The defendants objected on the basis of hearsay and the court overruled the objection. The witness then explained that he believed satisfied customers would talk to their friends and neighbors and generate new sales. The witness indicated the thought that the 50% estimate was very conservative. The witness made no explanation of any surveys relied upon.

Under *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, which adopted Federal Rule of Evidence 703 (Fed. R. Evid. 703), an expert witness is not required to state the reasons for his or her opin-

ion before stating the opinion. The witness may state the reasons on direct examination, even reasons which are not admissible in evidence, if those reasons are " 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' " (*Wilson*, 84 Ill. 2d at 193, 417 N.E.2d at 1326, quoting Fed. R. Evid. 703.) Randy Bullock gave as one of his reasons his reliance on unidentified surveys.

The implication of Randy Bullock's statement of his consideration of a survey was that the survey indicated that each two garage sales tends to generate an additional garage sale. This was a statement of hearsay, and no showing was made by plaintiff that the surveys were of the nature relied upon by experts as set forth in Federal Rule of Evidence 703. Thus, the objection should have been sustained as to Randy Bullock's describing surveys as a basis of his opinion and that answer should have been stricken. The evidence concerning additional sales lost after the year 1989 was very conjectural. When that evidence was supported by inadmissible hearsay, reversible error in regard to the amount of damages resulted.

We find no other claims of error which require reversal. We have examined defendants' contentions that plaintiff made judicial admissions and find every statement alleged to be such an admission to be sufficiently qualified, vague, indefinite, or explained to prevent it from fitting into that category. Plaintiff's exhibit No. 2, which was a diagram of its leasehold, was sufficiently authenticated and the prejudice claimed by defendants is not documented. Various letters between the parties or their agents which were offered by plaintiff and admitted into evidence bore upon the question of whether defendants acted with malice and were properly admitted into evidence. Other than as we have explained, testimony by Randy Bullock in regard to possible loss of sales was not rendered improper even if it did go to an ultimate issue in the case. (*Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809.) The claim of error arising from the testimony of plaintiff's witness, Michael Fox, is not before us because no objection was made at the time to his testimony.

Any error in the court's giving plaintiff's instruction on the doctrine of estoppel was also waived by the lack of objection to the instruction at trial. Under our ruling in regard to the law on easements and leaseholds as we have explained, no error resulted from the court's ruling on instructions on those questions. The court's decision to use Illinois Pattern Jury Instructions, Civil, No. 30.01 (3d ed. 1991), as modified, on the question of damages was not a breach of

discretion. Any attempt to set forth a definite formula might have confused the jury.

As we have indicated, we affirm the judgments on counts I and III to the extent they determine liability. We also affirm the judgment as to count II. We reverse the portions of the judgments on counts I and III to the extent they award damages. We remand to the circuit court of Vermilion County for a new trial on the issue of damages to be awarded as to counts I and III.

Affirmed in part, reversed in part, remanded with directions.

KNECHT, J., concurs.

JUSTICE LUND, specially concurring:

I concur with the majority opinion, but am somewhat concerned there may be a misunderstanding regarding use of surveys when giving expert opinions. Federal Rule of Evidence 703 (Rule 703) (Fed. R. Evid. 703) and Federal Rule of Evidence 705 (Rule 705) (Fed. R. Evid. 705) apply to all types of cases, not only those arising from medical malpractice. I envision fact situations where the opinions authorized under Rule 703 could be based upon survey evidence. That may be true even in the present case on retrial. If the survey questions have been carefully prepared to obtain responses which indicate information that could be relied upon in forming an expert opinion, and the survey was taken in a reasonable manner, then the survey result may well be a foundation for an expert's opinion.

In the present case, I envision such a survey to be a written inquiry to customers, asking reasons why the purchase of a new garage was made from the contractor. If the answers from a fair sample of past customers indicate purchases were made because of familiarity with garages recently constructed by the same contractor, then the information may well be the type reasonably relied upon in forming expert opinions or drawing inferences.

Normally, after an expert says the source is the type reasonably relied upon, the objecting party seeks to impeach during cross-examination. (See Rule 705.) In the present case, the issue was brought to the attention of the court, by a hearsay objection during the opinion testimony, when the witness mentioned his opinion was based upon undescribed surveys. Nothing in the testimony indicates there could be reasonable reliance on the surveys in forming an expert opinion. The record is also void of evidence indicating how the surveys were taken.

Public-opinion surveys determine marketing plans for many businesses in the modern economy. As long as these surveys are taken with a reasonable degree of scientific care, they may well be a valid basis for expert opinions and inferences.