K. S., PLAINTIFF, v. G. S., DEFENDANT.

Superior Court of New Jersey
Chancery Division
Hunterdon County

Decided October 20, 1981.

*Sharon B. Ransavage* for plaintiff (*Hunterdon County Legal Service Corporation*).

*Nicholas L. Bissell* for defendant (*Bissell, Welch & Welaj*, attorneys).

LOUIS H. MILLER, J. S. C.

This matter comes before the court on plaintiff wife's motion for *pendente lite* support and custody of the infant child, J. S., who was born during the course of plaintiff's marriage to defendant but was conceived by a technique of artificial insemination known as "artificial insemination by donor" (AID). Since a full exposition of the factual background is necessary for a proper understanding of the case, the following findings of fact are made.

The parties were married on December 6, 1977. Defendant had been previously married and divorced. After a third child was born of the prior marriage and before the marriage to present plaintiff, defendant voluntarily underwent a vasectomy operation which sterilized him. Plaintiff was aware of defendant's infertility prior to their marriage.

Several months after marriage plaintiff learned of the AID procedure. The parties were referred by their family physician to Lewis Ladocsi, an obstetrician and gynecologist, who specialized in the field of fertility. Ladocsi first saw the couple on July 8, 1978, at which time he intensively interrogated the couple, took a joint history and explained the AID process to them. He also noted physical characteristics of defendant for the purpose of obtaining a "matching" donor and directed that blood tests be taken for the purpose of aiding in the screening of donor applicants. Ladocsi questioned defendant closely in order to determine whether he understood and consented to AID. Defendant stipulates he gave his verbal consent to the procedure at that time.

Ladocsi did not, however obtain any written consent from defendant. He indicated that at the time it was not his practice to obtain written consents from AID patients. His present practice, however, is to obtain written consent before commencing the AID process. New Jersey statutory law does not require written consent be obtained by a physician before the commencement of AID procedures, and did not in 1978.

A suitable donor was selected and a series of three artificial insemination procedures took place in July 1978. The initial insemination process was successful and plaintiff was tested positive for pregnancy on August 19, 1978. That pregnancy did not result in a live birth because a spontaneous miscarriage took place in early September 1978.

Defendant, after the miscarriage, expressed feelings of sympathy and urged plaintiff to continue the procedures when she was able to do so. Although defendant testified to the contrary,

the court finds that he expressed no reservations to continuing the AID procedures for any reason at that time.

During 1978 the parties had several discussions concerning the continuing cost of the AID procedures, which placed a strain on the family budget and resulted in several overdrafts on the joint checking account. Defendant contends he told plaintiff to stop the AID treatments because of the cost. This testimony is not credible and is inconsistent with plaintiff's convincing testimony that defendant accompanied plaintiff to Ladocsi's office for the insemination procedure on several occasions in 1979, including at least one occasion in October 1979. Defendant also admitted he never advised Ladocsi at any time that he had any reservations concerning continuing the AID procedure.

Commencing in November 1978 plaintiff continued with the AID procedures at the rate of approximately three inseminations during her fertile cycles. Various medications were prescribed and various examinations were employed to confirm her continuing ability to conceive, since she failed to become pregnant for many months. Finally, in October 1979 she became pregnant with J. S.

After plaintiff's pregnancy was confirmed defendant became distant and uncommunicative. On December 30, 1979 he left the marital premises "to think things out." In a telephone conversation between the parties shortly after that date defendant advised plaintiff he objected to her pregnancy.

The parties continued to live separately until the child was born on July 28, 1980. Plaintiff filed a complaint for divorce on October 7, 1980, seeking support for the child. Defendant has never seen the infant or contributed to its support.

It is clear that in the absence of a husband's consent to artificial insemination, support obligations may not be imposed on him. *People v. Sorenson*, 68 *Cal.2d* 280, 66 *Cal.Rptr.* 7, 437 *P.* 2d 495 (Sup.1968); *Adoption of Anonymous*, 74 *Misc.2d* 99, 345 *N.Y.S.2d* 430 (Surr.Ct.1973). Legislation addressing the problem of the paternal duties created by artificial insemination has likewise uniformly conditioned imposition of all such obligations

in a marital context upon a husband's valid consent to use of the procedure. *Alaska Stat.* § 20.20.010 (1975); *Ark.Stat.Ann.* § 61–141(c) (1971); *Cal.Civ.Code* § 7005 (West 1975); *Colo.Rev. Stat.* § 19–6–106 (1977); *Conn.Gen.Stat.* § 45–69f (1975); *Fla. Stat.Ann.* § 742.11 (West 1973); *Kan.Stat.* § 23–130 (1977); *La.Civ.Code Ann.* art. 188 (West 1975); *Md.Est. & Trusts Code Ann.* § 1–206(b) (1975); *Mont.Rev.Codes Ann.* § 40–6–106 (1975); *N.Y.Dom.Rel.Law* § 73 (McKinney 1974); *N.C.Gen.Stat.* § 49A–1 (1974); *Okla.Stat.* tit. 10, § 552 (1974); *Or.Rev.Stat.* § 109.243 (1977); *Tex.Fam.Code Ann.* tit. 12, § 12.03 (Vernon 1977); *Va.Code* § 64.1–7.1 (1977); *Wash.Rev.Code Ann.* § 26.-26.050(1) (West 1976); *Wyo.Stat.* § 14–2–103(a) (1978).

In the case at bar, the initial consent of the husband is clearly established. Defendant contends he withdrew his consent to the AID procedure prior to conception by informing plaintiff of his opposition to continuing the inseminations. He further contends that plaintiff then went ahead with AID procedures surreptitiously and without his knowledge or approval in the face of his opposition.

In the present case the initial AID sequence was followed first by a miscarriage, then by resumption of artificial insemination procedures. As the procedures continued and pregnancy did not result, alternative courses of treatment for infertility were attempted, each followed by another series of AID procedures. When plaintiff finally conceived, it was approximately 15 months after defendant's initial consent.

Two questions are therefore presented. First, does consent to AID, once given, continue until pregnancy is accomplished? Second, if consent be deemed to continue, what burden of proof must be met to establish withdrawal of consent?

Legislation which has considered artificial insemination has favored continuation of consent. Such a result is achieved by presuming the husband's initial and continuing consent to artificial insemination procedures and placing the burden on him to establish otherwise.

The Arkansas statute declares that:

... (c) Any child conceived following artificial insemination of a married woman with the consent of her husband shall be treated as their child for all purposes of Intestate succession; consent of the husband is presumed unless contrary is shown by clear and convincing evidence. [Ark.Stat.Ann. § 61–141(c)]

AID-induced pregnancy is equated with naturally induced pregnancy occurring during the course of a marriage for purposes of analysis of questions concerning traditional issues of legitimacy and parental obligations.

The Maryland statute is less specific, providing that:

...A child conceived by artificial insemination of a married woman with the consent of her husband is the legitimate child of both of them for all purposes. Consent of the husband is presumed. [Md.Code Ann. § 1–206(b)]

Although no cases are reported in that jurisdiction dealing with legitimacy in the context of artificial insemination, it has been held that the presumption of legitimacy may be rebutted by "contrary evidence ... of greater persuasion than that having given rise to the presumption...." *Zamaludin v. Ishoff*, 44 *Md.App.* 538, 409 *A.2d* 1118, 1121 (Ct.Spec.App.1980), interpreting *Md.Code Ann.* § 1–105(b).

In legitimacy or paternity cases where pregnancy has been naturally induced, the central issue is often an evidentiary question of access or nonaccess of the putative father at the time of conception. In New Jersey, in order to sufficiently rebut the presumption of legitimacy of a child born or conceived prior to the dissolution of marriage in such cases, proof of illegitimacy must be such that "there is no possible escape" from that conclusion. *In re Rogers' Estate*, 30 *N.J.Super.* 479 (App. Div.1954); *Egnozzi v. Egnozzi*, 17 *N.J.Super.* 433 (App.Div.1952). If proof of illegitimacy is by nonaccess of the husband, evidence of nonaccess must be clear and convincing, strong and irresistible, or something just shy of absolute certainty. *Jackson v. Prudential Ins. Co. of America*, 106 *N.J.Super.* 61, 77 (Law Div.1969).

The court recognizes that, from the point of view of the partners involved in artificial insemination, there is a physical

and psychological difference in the manner the pregnancy will be perceived.

From the point of view of the female partner, although the child is conceived artificially, from all other aspects it is a natural child, carried to term exactly as if conception had taken place by natural means. While there may be a lingering question in her mind during the pregnancy as to what the child's physical characteristics may be, after undergoing the painful and emotional experience of childbirth, that uncertainty will be resolved.

For the male partner, on the other hand, it is quite possible that his perception of the pregnancy will be substantially different. He is not the natural father, as the mother is the natural parent, and must be well aware of that fact. He may experience feelings of inadequacy, resentment or other negative attitudes toward the pregnancy, as illustrated by the case at bar.[1] Thus, from the male point of view the pregnancy and resulting issue is, in many ways, akin to an adoption of the resulting child. However, whereas society has seen fit to regulate the artificial status of parent and child resulting from the adoption process, to insure as much as possible the stability of the relationship being created, no such protections exist at this time with regard to the field of artificial insemination. *N.J.S.A.* 9:3–17 *et seq.* Until such safeguards are supplied by legislative enactment, they must be supplied on a case-by-case basis.

In artificially induced pregnancy cases, nonaccess, of course, becomes irrelevant but is replaced by the issue of consent in order to establish legitimacy. Since consent, once it is disputed,

---

[1] Defendant, after hearing that plaintiff had become pregnant, expressed several reasons for not wanting the pregnancy to continue. He resented the cost of the AID procedures; he expressed concern that the new child would cause him to fall further behind with regard to support obligations pertaining to three children by a former marriage; he did not know what the child would "look like"; he considered the child "to be a bastard," and generally, he felt bad about the pregnancy because "it wasn't my child."

is often far more difficult to prove to the same degree of certainty as physical access, it is only practical and reasonable to apply a rebuttable presumption criterion in determining threshold evidentiary questions as to the existence of consent at a certain point in time. This is particularly true when the question becomes one of withdrawal of an initial consent to the procedure.

Many states have resolved this problem by enacting statutes requiring that consent be provided in writing, although none specifically requires revocation of consent to be of the same formality. *Alaska Stat.* § 20.20.010 (1975); *Cal.Civ.Code* § 7005 (West 1975); *Colo.Rev.Stat.* § 19–6–106 (1977); *Conn.Gen.Stat.* § 45–69f (1975); *Fla.Stat.Ann.* § 742.11 (West 1973); *Kan.Stat.* § 23–130 (1977); *Mont.Rev.Codes Ann.* § 40–6–106 (1975); *N.Y. Dom.Rel.Law* § 73 (McKinney 1974); *N.C.Gen.Stat.* § 49A–1 (1974); *Okla.Stat.* tit. 10, § 552 (1974); *Tex.Fam.Code Ann.* tit. 12, § 12.03 (Vernon 1977); *Va.Code* § 64.1–7.1 (1977); *Wash. Rev.Code Ann.* § 26.26.050(1) (West 1976); *Wyo.Stat.* § 14–2–103(a) (1978).[2] Such legislative mandate achieves certainty and also diminishes problems of legal proof.

Public policy considerations seeking to prevent children born as a result of AID procedures from becoming public charges or being bastardized require that a presumption of consent exist and that a strong burden be placed on one seeking to rebut the presumption. *C. M. v. C. C.*, 152 *N.J.Super.* 160, 166 (Cty.Ct.1977). The same policy considerations are present whether the question presented is one of initial or continued consent. The absence of any authority limiting the continuing effectiveness of consent also leads to the conclusion that consent of the husband (in the case of married partners), once given, is presumed to be effective at the time when pregnancy occurs,

---

[2]States which do not require consent to be in written form include Louisiana and Oregon. Maryland and Arkansas, while not requiring written consent, escape the problems affiliated with lack of formal consent requirements by the strong presumptions of consent discussed above.

unless the husband establishes by clear and convincing evidence that such consent has been revoked or rescinded. Defendant has not met that burden.

Insofar as this is the case, the best interests of the child, the mother, the family unit and society are served by recognizing that the law surrounding AID insemination deals with the creation of a family unit and more particularly with the creation of parent-child relationships. Thus viewed, the public policy objectives served by legitimacy laws should similarly and consistently be applied in dealing with closely related problems presented by the use of AID techniques.

Accordingly, defendant is declared to be the lawful father of J. S. and as such bears at least partial responsibility for the child's support. The amount thereof is deferred pending submission by the parties of updated financial data to the court within 20 days of the date hereof.

The issue of custody is not disputed at all by defendant. Therefore, custody of J. S. is granted to plaintiff. Defendant is granted reasonable and liberal visitation with the child, should he choose to exercise it, subject to the requirement that he advise the plaintiff by telephone at least 24 hours in advance of each visit of his intention to exercise visitation.