In re MARRIAGE OF RITARAY ADAMS, Petitioner-Appellee, and JOHN N. ADAMS, Respondent-Appellant.

Second District No. 2—87—0601

Opinion filed September 15, 1988.

596

. DUNN, J., concurring in part and dissenting in part.

Schiller, Du Canto & Fleck, Ltd., of Chicago (Sarane C. Siewerth, of counsel), for appellant.

William G. Rosing, of Rosing, Applehans & Smith, Ltd., of Waukegan (Charles W. Smith, of counsel), for appellee.

Julie A. Lundquist, of Lundquist & Mitchell, of Zion, guardian *ad litem*.

JUSTICE WOODWARD delivered the opinion of the court:

This is a case of first impression in Illinois.

Respondent, John Adams, appeals from that portion of the judgment dissolving his marriage to the petitioner, Ritaray Adams, requiring him to pay child support for a child conceived by Ritaray during the marriage by artificial insemination. This court must decide if the lack of the written consent of the husband of the woman who was artificially inseminated in order to conceive a child bars an action for support of such child so conceived since the written consent of such husband is required by statute.

The facts are as follows.

The parties were married on June 3, 1983. It was a second marriage for both of them. John had three children by his first marriage; Ritaray had no children with her first husband. At the time of the marriage, John, who was 32 years of age, was in the United States Navy (Navy) and had achieved the rank of chief warrant officer, fourth grade, and worked as a physician's assistant in the obstetrics and gynecology department at Great Lakes Naval Base. He had a bachelor of science degree from the University of Nebraska in premed and had received additional training in an intensive two-year program at the Naval School of Health Care Sciences. Ritaray was 19 years old at the time of the marriage and did not have a high school diploma. During the marriage, she worked as a waitress, counter clerk, and dining room manager of a restaurant.

During his first marriage, John had undergone a vasectomy, a fact which Ritaray was aware of prior to their marriage. Both before and after his marriage to Ritaray, John attempted to have the vasectomy surgically reversed, but both attempts were unsuccessful. John and Ritaray had had discussions concerning having a family at various other times before and after their marriage, and John had promised Ritaray to look into alternative methods of having children. Thus, when the second attempt at surgical reversal of the vasectomy proved unsuccessful, they began considering other options available to them.

In October 1983, John was transferred to the naval base at Jacksonville, Florida. The parties then began to explore the options available to them for having a child. They looked into adoption and testicular biopsy (a procedure whereby the husband's sperm is checked to see if it can be extricated and used to impregnate the wife). Since both the procedures entailed significant delays, they were rejected, and the parties discussed a procedure known as artificial insemination donor (AID). Although each party testified that the other had first mentioned the possibility of the AID procedure, they both agreed that

they discussed it several times over the spring and summer of 1984. According to John, Ritaray became obsessed with the idea, repeatedly bringing up the subject and asking if he could find the name of someone who performed the procedure. John was given the name of Dr. Farrell, an infertility specialist at the University of Florida in Jacksonville.

On September 28, 1984, the parties had their initial interview with Dr. Farrell. They each filled out a fertility history. John told Dr. Farrell that they were there to learn more about artificial insemination. The doctor proceeded to discuss the information on the sheet, the method of choosing donors, and the procedure itself. Dr. Farrell also informed them that successful insemination usually required three attempts. According to both parties, at no time were consents ever discussed. At the conclusion of the meeting, the doctor told them to go home and talk it over.

According to John, once he knew the details of the entire procedure, he knew he could not go through with it because it reminded him too much of his first wife's infidelity, with which he had lived for four years before finally deciding to end the marriage. He told Ritaray that he could not psychologically handle the situation, at least not without some counseling. Ritaray denied he ever mentioned counseling. John never spoke to Dr. Farrell again; he did not accompany Ritaray to the university hospital for any of her appointments, for the sonogram or the AID treatments; however, he did not call Dr. Farrell to object to the upcoming insemination.

On October 6, 1984, Ritaray flew to Illinois to visit her family. In a telephone conversation with John, two days later, she related to him how happy her family was about the upcoming AID procedure. When John protested and reminded her that they had made no decision yet, an argument ensued, and John hung up on her. Later, in another conversation, they argued again, and Ritaray advised him that she was going to go ahead and go through with the artificial insemination. However, according to Ritaray, she discussed the AID procedure with her sister, Cindy Duenos, and the manager of the Shawnee's Restaurant where she worked. After Ritaray returned to Florida, she made an appointment with Dr. Farrell to proceed with the insemination.

In preparation for the insemination procedure, Ritaray used a basal thermometer to chart her normal changes indicative of her fertile periods. The parties differed on who obtained the thermometer, each testifying the other had provided it. Ritaray testified that she did not understand the graph she was to use to record the temperature changes, and John had to show her how to mark the graph. However,

John stated that he did not help her with the temperature chart other than to answer one question about a particular line. John saw the chart next to Ritaray's side of the bed but never looked at it.

During the same time period, John, who handled the family finances, became increasingly alarmed over money matters. By the spring of 1984, the parties were experiencing severe financial difficulties. They argued frequently over Ritaray's spending habits. Eventually, John took away all of her credit cards except her American Express card. Although he asked her not to use her credit card, she continued to charge large amounts. By fall 1984, their debts, excluding the mortgage on their mobile home, were over $30,000, and John began to think about filing for bankruptcy.

On the day before Thanksgiving, 1984, Ritaray informed John that she had an appointment with Dr. Farrell the following day for a sonogram to check the disposition of the egg follicle; however, if she kept the appointment, she would lose her job at the Shawnee Restaurant. According to John, he reminded her that they were so deeply in debt, he had already contacted a bankruptcy attorney. He then began to cry, telling her he could not stand the thought of someone else's sperm being injected into her body. Ritaray said that she did not care, and then John asked who would support the child, and she said she would. John stormed out.

Ritaray's version of those same events was somewhat different. She stated that she thought she had arranged with the manager of the restaurant to keep her doctor's appointment, although she knew all employees were to be at work on Thanksgiving. When John and she talked that evening, Ritaray did not recall that they had an argument, that John had cried and begged her not to go, or that he had said that the marriage would be over if she went. According to Ritaray, her sister, Cindy, took her to the doctor's for the sonogram on Thanksgiving because John had other plans.

On Thanksgiving day, Ritaray went for the sonogram and was fired from her job. When she came home, she told John that the insemination would be done the following Monday, at which point the parties had another heated argument. Ritaray recalled her sister, Cindy, came for Sunday dinner, the night before the insemination, a fact which John did not recall. According to both Ritaray and Cindy, John remarked that Cindy would have to drive Ritaray to the doctor because the 1966 Volkswagen was not running. However, both parties testified that John usually drove the Volkswagen while Ritaray drove the 1984 Thunderbird, and according to John, both cars were in working order.

John testified that on that same Sunday night, he again told Ritaray he did not want her to have the insemination done, not only because of his psychological objection, but also because she had lost her job, and they could not afford to lose her income and have a child as well. However, both Ritaray and Cindy testified that John did not state that he did not approve, nor did he express anything negative but participated in the discussion about the insemination and arranged for Ritaray's transportation.

According to John, from the time Ritaray had the artificial insemination, the relationship between them became quite cold, with conversation only when necessary. John slept on the couch.

On December 18, 1984, John received the results of Ritaray's pregnancy test confirming she was pregnant, and he asked to leave work early. On the way home, he bought beer and wine which he started to drink because he was depressed. When he told Ritaray the news, she began to call her family and friends with the news. John, who ordinarily drank very little, recalled talking to his mother but did not remember placing the call.

John testified that for the next nine months, the parties merely existed in the same household. Although he was very depressed and embarrassed about the bankruptcy, he did not seek counseling or tell anyone where he worked about the situation at home. He occupied his free time by working out at the base fitness center. John accompanied Ritaray to her Lamaze classes only after Ritaray began asking his superiors to accompany her because John refused to do so. However, Ritaray denied making such requests and stated that during her pregnancy, John treated her with concern and gave her much advice.

The parties filed a joint petition in bankruptcy in March 1985. Although over $32,750 indebtedness was discharged, more than $37,000 remained. According to John, the parties had no social life during this period, nor did he accompany Ritaray on any visits to her doctor. He admitted, however, that although the relationship was strained, he loved Ritaray at the time.

As the time for the birth approached, the parties discussed names for the baby, whether Ritaray should breast feed, and whether the child, which the sonogram had indicated would be a boy, should be circumcised. John explained, however, that Ritaray chose the name, and while he encouraged her to breast feed, it was simply because it was healthier. He recommended circumcision because of the lowered instance of penile cancer. When Ritaray was into labor, he drove her to the hospital because it would have taken 10 to 15 minutes for an ambulance or police car to get there. Ritaray had to have a Caesarian

section, so John was not present for the actual birth. John was on his way to the recovery room when he happened to see the baby being taken to the nursery. Ritaray recalled, however, that John had handed her the baby in her room. Ritaray had John's name entered as the father on the birth certificate, and she filled out all the birth announcements.

John drove Ritaray and the baby home from the hospital. Once at home, Ritaray began suffering from an abscessed tooth and also had difficulty breast feeding. The baby was also fussy at times. John brought home dextrose, an infant supplement. On one occasion when the baby was choking, John picked up the baby and patted his back until the mucous was cleared. On another occasion, John could not sleep because the baby was fussy, so he brought the baby out to the couch, and he and the baby fell asleep together on the couch.

Six weeks after John David's (J.D.'s) birth, Ritaray took him to the base hospital for his post-natal checkup. A Navy department medical card was automatically issued for him because Ritaray presented her own Navy identification card. Immediately thereafter, John took Ritaray and J.D. to the airport where they boarded a flight for Illinois. Ritaray's sister, Cindy, paid for the tickets. According to Ritaray, John was under severe strain, and she left so that he could be alone and have some peace. She anticipated being gone for about a month, but no arrangements were made for their return.

On January 2, 1986, John came to Illinois to discuss the matter with Ritaray. Ritaray had sent John a Christmas gift, so he took her to the Navy exchange at Great Lakes, where she chose some clothing for herself and a car seat for J.D. They then drove to the parking lot of a restaurant to discuss their future. John told Ritaray he wanted a divorce. Ritaray initially rejected the idea, but later agreed when John told her he could not accept and live with what happened. John proposed sending her $50 on the 15th and 30th of each month, a sum which the parties labeled child support. This would be for a limited time. John also agreed to get financing for a new car for Ritaray. Ritaray told him what furnishings and personal items she wanted out of the trailer. John agreed to give her $500 for the bedroom set which was anchored to the floor of the mobile home.

John told Ritaray that he would have the agreement typed up by a notary public in Florida at a cost of $35 and then send it to Ritaray for her approval and signature. Thereafter, he would proceed to obtain a Florida no-contest divorce, an essentially *pro se* proceeding in which one of the parties presents a fully executed, notarized settlement agreement to the court, pays a $60 filing fee, and then appears

before a judge 21 days later, and the divorce is finalized. John also gave Ritaray $150 to pay an attorney in Illinois to review the document after it was drafted.

After John's return to Florida, he received a letter dated January 10, 1986, from Ritaray acknowledging their agreement but disagreeing with the time limitation provision for the child support. Instead, she proposed that John pay her $100 per month until J.D. was either 18 or had completed eight years of school, provided John carried all the medical insurance during the child's minority. She also agreed that if she remarried within the four-year period of their agreement on the car, she would take over all payments on the car only if he would agree to one of her alternatives on the duration of the child support. When the document was drafted, the child support provision was altered as Ritaray had requested. However, when John sent the drafted agreement back to her, she neither signed it nor sent it back.

In February 1986, John was advised by his income tax preparer that it would be better for the parties to file a joint income tax return than file separately. Ritaray agreed, and a joint income tax return showing John's three children from his first marriage and J.D. as dependents.

On March 11, 1987, John sent Ritaray a letter demanding that she either sign the proposed settlement agreement or contact him so that they could discuss the matter further. After receiving the letter, Ritaray filed her petition for dissolution of marriage. John was served in Florida. He obtained Illinois counsel and filed a response and an affirmative defense, stating that he was not the natural or biological father of J.D., that he never consented and strenuously objected to his wife's artificial insemination, and that he should not be held responsible for the care, custody, or support of the child.

At the outset of the proceedings in this case, the trial court ruled that in view of the nature of the matters raised by the pleadings, the issue of paternity would be decided before any of the other matters. The parties also stipulated that the Illinois law would be applied rather than Florida law. John's motion for summary judgment based upon the Illinois Parentage Act requirement of written consent (Ill. Rev. Stat. 1985, ch. 40, par. 1453) was denied. Prior to the commencement of trial, the court, *sua sponte*, appointed an attorney for the minor child, whose fees the parties were ordered to share. Following a hearing, the trial court determined John actually furnished consent for the AID procedure and, thus, was estopped from denying his legal parental responsibilities for J.D.

At the subsequent hearing on all the remaining issues, the fol-

lowing evidence was introduced: the parties' assets consisted of a mobile home, presently in storage, and various kitchen utensils and personal items John had already sent to Ritaray. The bankruptcy proceeding discharged approximately $32,000, of which $2,400 was John's premarital debt. John's net pay at the time of the hearing was $2,610. Thus, current bills which include $200 per child for each of his children by his first wife result in his paying out more than he takes home. He keeps up with his obligations by borrowing against a line of credit. Ritaray, on the other hand, was unemployed at the time of the hearing and had been living with her mother, paying her $50 per month. Her support comes from Public Aid and $100 from John per month.

Following all of the testimony and closing arguments, the trial court awarded sole care and custody of J.D. to Ritaray with reasonable visitation to John. John received the Subaru automobile, the mobile home, his entire pension, and all of the marital debts. As long as John remained in the military, he was responsible for all ordinary medical payments and one-half of any unpaid expenses.

On the issue of child support, the trial court stated that the base pay of $2,610, less $236 for the children's medical and dental payments, $600 for their support, and $550 for credit obligations, for a total deduction of $1,400, would leave a net income of $1,200 per month. The trial court then awarded $240 as child support, that figure being 20% of the guideline figure for one child as child support.

Following a hearing on the issue of attorney fees, both parties were ordered to pay their own attorney fees. The fees for the attorney for the child of $4,049.75 were divided between the parties, John paying 60% and Ritaray paying 40%. This appeal followed.

John raises the following issues on appeal: Whether the trial court abused its discretion in denying John's motion for summary judgment; whether the trial court abused its discretion in finding that the evidence established John's actual consent to Ritaray's artificial insemination; whether the award of child support constituted an abuse of discretion; and whether the trial court abused its discretion in appointing an attorney for the minor child and ordering John to pay 60% of the fees for the attorney for the minor child.

John contends, first, that the trial court abused its discretion when it denied his motion for summary judgment.

■ The Illinois Parentage Act (Ill. Rev. Stat. 1985, ch. 40, par. 1451 *et seq.*) was enacted on January 5, 1984, and provides that any child born as a result of "heterologous artificial insemination" is considered to be the legitimate child of the husband and wife who have

requested and consented to the procedure. (Ill. Rev. Stat. 1985, ch. 40, par. 1452.) With regard to the taking of the consent, the statute provides in pertinent part as follows:

"If, under the supervision of a licensed physician and with the consent of the husband, a wife is inseminated artificially with semen donated by a man not her husband, the husband shall be treated in law as if he were the natural father of a child thereby conceived. *The husband's consent must be in writing executed and acknowledged by both the husband and the wife.* The physician who is to perform the technique shall certify their signatures and the date of the insemination, and file the husband's consent in the medical record where it shall be kept confidential and held by the patient's physician. However the physician's failure to do so shall not affect the legal relationship between the father and child." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 40, par. 1453(a).

The parties are in agreement that no written consent to the artificial insemination by John was ever obtained. Ritaray contended that John consented orally to the procedure.

Before reaching the merits of the motion for summary judgment, we must determine whether, as Ritaray contends, the order denying the motion for summary judgment is reviewable on appeal. The denial of a motion for summary judgment is not immediately appealable since it is not a final or appealable order. (*Cedric Spring & Associates, Inc. v. N.E.I. Corp.* (1980), 81 Ill. App. 3d 1031, 1032.) It is also well established that, after an evidentiary hearing, a previous order denying a motion for summary judgment, even if improperly denied, is neither appealable nor reviewable upon appeal, since the ruling on the motion is merged into the trial result. *Banwart v. Okesson* (1980), 83 Ill. App. 3d 222.

On the other hand, John contends that his motion for summary judgment fits squarely in the exception to the rule recognized in *Cedric Spring & Associates, Inc.*, that nothing precludes an appellate court from reviewing the denial of a motion for summary judgment in an appeal from a final judgment where there has been no evidentiary hearing and the party seeking review has done nothing to avoid trial. (*Cedric Spring & Associates, Inc.*, 81 Ill. App. 3d at 1033.) John argues that his motion for summary judgment addressed the issue of his right as a matter of law to judgment in his favor because of the mandatory, statutorily imposed requirement of written consent before parental obligation may be imposed on the husband of a wife who bears a child through the AID process, and that the subsequent evidentiary

hearing addressed a completely different issue, that of John's actual consent.

 The rationale behind the court's refusal to review the denial of a motion for summary judgment appears to be that such review would be unjust to the party that was victorious at trial, which won judgment after the evidence was more completely presented, where cross-examination played its part and where witnesses were seen and appraised. Otherwise, a decision based upon less evidence would prevail over a verdict reached on more evidence, and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of evidence. This would defeat the fundamental purpose of judicial inquiry. *Home Indemnity Co. v. Reynolds & Co.* (1962), 38 Ill. App. 2d 358.

 In view of the above, this court will address the issue of the denial of the motion for summary judgment. The motion for summary judgment dealt only with the requirement of written consent, whereas the evidentiary hearing was held to determine whether there was actual consent on John's part to the AID procedure and did not deal with whether there was written consent. Therefore, the rationale from *Home Indemnity Co.* would suggest that this case falls into the exception recognized in *Cedric Spring & Associates, Inc.*

Turning to the merits of the denial of the motion for summary judgment, we observe that while the statute requires the consent of the husband to be in writing, the parties here agree that the husband never gave a written consent. The trial court, in denying the motion for summary judgment, found that an issue of fact did exist as to whether there was actual consent, which would constitute a waiver of the statutory requirement that the consent be in writing.

 The language in the Illinois Parentage Act was largely adopted from the Uniform Parentage Act (Act) (Unif. Parentage Act §5 (1973)). The functions of the Act were to legitimize a child conceived through the AID procedure as long as the husband consented; it relieved the third-party donor of any parental responsibility; and it permitted discovery of records upon "good cause shown." (Note, *The Legal Incubation of Artificial Insemination: A Proposal to Amend the Illinois Parentage Act*, 18 J. Marshall L. Rev. 797 (1985).) The article goes on to point out that the current Act fails to define the rights and obligations of the parties where the husband does not consent to the procedure. One view is to regard such a child as illegitimate where no consent has been obtained since the child was born against the will of the husband, and therefore, the law should not force the husband to support the child. Another view is expressed as follows:

"Some commentators, however, have espoused an alternative theory which avoids the stigma of labeling an AID child as illegitimate. If an AID child is conceived without the husband's consent, but nevertheless is subsequently supported by the husband, then the child should be regarded as the legitimate and natural child of the married couple. Thus, if the couple is later divorced, the husband would be estopped from avoiding child support payments." (18 J. Marshall L. Rev. at 799.)

The article proposes that an amendment be made to the Act to guard the rights of the minor child in such situations. The article suggests that there be a waiver, such as in cases where the husband supported the child conceived by the AID process, of the requirement of a written consent. In addition, in this case, in her response to the motion for summary judgment, Ritaray alleged that John consented orally to the procedure and never objected to the procedure at any time prior to its occurrence. John denied that he orally consented to the procedure.

In the case of *R.S. v. R.S.* (1983), 9 Kan. App. 2d 39, 670 P.2d 923, the Kansas court had occasion to construe a statute quite similar to the Illinois Parentage Act in a similar factual setting. In that case, the wife first considered donor insemination at the husband's suggestion. They consulted with a medical specialist at the Kansas University Medical Center concerning the procedure. The husband orally consented to the procedure performed on the wife, but the doctor failed to require the husband to sign a written request pursuant to Kan. Stat. Ann. §23—128 (1981). The wife received donor insemination but did not conceive and discontinued treatment. The husband denied giving his oral consent again when the wife resumed treatment. The husband was aware of the treatments and did not object, but he had no contact with the treating doctor. The wife conceived this time.

Kan. Stat. Ann §23—128 provided in pertinent part as follows:

"23—128. Artificial insemination; performance; consent. The technique of heterologous artificial insemination may be performed in this state at the request and with the consent in writing of the husband and wife desiring the utilization of such technique for the purpose of conceiving a child or children." (*R.S.*, 9 Kan. App. 2d at 39, 670 P.2d at 924; Kan. Stat. Ann. §23—128 (1981).)

Section 23—130 provided in pertinent part:

"23—130. Artificial insemination; consent executed and filed; file not open to the public. The consent provided for in this act shall be executed and acknowledged by both the husband and

wife and the person who is to perform the technique." *R.S.*, 9 Kan. App. 2d at 39-40, 670 P.2d at 925; Kan. Stat. Ann. §23—130 (1981).

Just as in the case before this court, the husband argued that the Act required the written consent of the husband before a child born as a result of heterologous insemination can be considered the same as a naturally conceived child of the husband. Further, the Kansas court observed that none of the applicable statutes indicated whether a husband has the duty to support a child conceived by heterologous insemination with oral consent but without written consent of the husband. As in Illinois, the case was one of first impression in Kansas.

In reaching its decision in the case before it, the Kansas court reviewed several decisions from other States in which a duty to support had been found based on a husband's actions, the doctrine of equitable estoppel and implied consent. In *Gursky v. Gursky* (1963), 39 Misc. 2d 1083, 242 N.Y.S.2d 406, the New York court found that a child born of heterologous insemination was not the legitimate issue of the husband even though he had consented to the procedure because there was no statutory procedure to legitimize such a child. Nevertheless, the court ordered the husband to support the child, holding that the "consent" executed by the husband was a request for the physician to conduct artificial insemination for the express purpose of providing a child for the mutual happiness of the parties and that there was no indication that the wife would have undergone artificial insemination in the absence of the husband's consent. Thus, the court concluded, the husband was liable for the support of the child, whether on the basis of an implied consent to support, or by reason of the application of the doctrine of estoppel. In *K.S. v. G.S.* (1981), 182 N.J. Super. 102, 440 A.2d 64, the wife did not conceive until approximately 15 months after the husband gave his oral consent to the artificial insemination. The husband claimed that he withdrew his consent and that the wife proceeded without his knowledge or approval. In the absence of statutory authority, the New Jersey court held that once given, the consent of the husband was effective at the time the pregnancy occurs, unless the husband establishes by clear and convincing evidence that the consent has been revoked or rescinded. In that case, the husband failed to meet that burden. Although not dealing with artificial insemination, the Kansas court found the case of *In re Marriage of L.M.S. v. S.L.S.* (Wis. App. 1981), 105 Wis. 2d 118, 312 N.W.2d 853, to be analogous to the case before it. In that case, the husband, who was sterile, and who wanted his wife to have a child, suggested to his wife that she become pregnant by another man, and that he would ac-

knowledge the child as his own. A child was conceived in that manner, and the husband acknowledged the child as his own. Nevertheless, in the divorce proceedings, he denied he had agreed to his wife's becoming pregnant by another man. The trial court found that he had so agreed and imposed child support obligations on him. In affirming the trial court, the Wisconsin Court of Appeals held that a husband who participates in the arrangement for the creation of a child has a legal obligation to support the child for whose existence he is responsible.

The Kansas court then reviewed the pertaining statutes and found nothing in the statute that expressed a legislative intent that a husband who orally consents to heterologous insemination cannot be held responsible on an equitable or implied consent theory. The court concluded as follows:

> "We hold that when a husband consents to heterologous insemination of his wife, that consent is presumed to continue through the time the wife becomes pregnant unless the husband establishes by clear and convincing evidence that such consent had been withdrawn; and a husband who with his wife orally consents to the treating physician that his wife be heterologously inseminated for the purpose of producing a child of their own is estopped to deny that he is the father of the child, and he has impliedly agreed to support the child and act as its father." R.S., 9 Kan. App. 2d at 44, 670 P.2d at 928.

■ John points out that the Illinois legislature used the term "must" in connection with the requirement of the husband's written consent, whereas the direction to the physician to certify the signature used the word "shall" and under the statute failure to comply with the direction does not affect the father/child relationship. Thus, John reasons, the use of the term "must" dictates the necessity of written consent. However, Black's Law Dictionary defines "must" as follows:

> "This word, like the word 'shall,' is primarily of mandatory effect; and in that sense is used primarily in antithesis to 'may.' But this meaning of the word is not the only one, and it is often used in a merely directory sense, and consequently is a synonym for the word 'may' not only in the permissive sense of that word, but also in the mandatory sense which it sometimes has." Black's Law Dictionary 530 (Abridged 5th ed. 1983).

As in the case of R.S. v. R.S., there is no indication in the statute here that bars the imposition of a support obligation on an estoppel or waiver theory where written consent of the husband was not obtained. Therefore, we conclude that the use of the term "must" does

not bar further inquiry into the circumstances surrounding the decision to utilize the AID procedure.

■■ ■ Summary judgment is proper where the pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is not a genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) In *Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, the court stated as follows:

> "Estoppel refers to reliance by one party on the word or conduct of another so that the party changes his position and subsequently suffers harm. It arises whenever one by his conduct, affirmative or negative, intentionally or through culpable negligence, induces another to believe and have confidence in certain material facts, and the latter, having the right to do so, relies and acts thereon and is, as a reasonable and inevitable consequence, misled to his injury. Estoppel must be proved by clear, unequivocal evidence. Although an intent to mislead is not required, the reliance must be reasonable. Furthermore, to claim reliance on the conduct of another, the party must have acted without knowledge of the truth of the matter relied upon. Finally, the conduct of the person seeking the benefit of the doctrine may be scrutinized. [Citation.]" *Gary-Wheaton Bank*, 130 Ill. App. 3d at 95-96.

■■ After reviewing the motion for summary judgment, the response thereto, and the documents pertinent thereto, we conclude that there was a genuine issue of fact as to whether John should be estopped from denying responsibility for J.D. on the basis that he did not consent in writing to the AID procedure.

Next, John contends that the trial court abused its discretion in finding that the evidence established John's actual consent to Ritaray's artificial insemination.

■■ A trial court's findings of facts are entitled to great deference and should not be reversed by this court unless they are clearly against the manifest weight of the evidence. (*In re Marriage of Los* (1985), 136 Ill. App. 3d 26.) In determining that John consented to the AID procedure, the trial court made 35 separate findings of fact. In making those findings, the trial court acknowledged that both parties advanced diametrically opposed theories on the issue of consent and that both parties were impeached on certain points to which each testified. Of these findings of fact, the following are quite significant:

> "1. In order to have children with Ritaray, John tried on two occasions to have his vasectomy reversed.

2. The parties discussed the AID procedure which was primarily introduced to Ritaray through the medical writings John brought home and John's conversations. John also obtained the name and address of Dr. Farrell.

3. Both parties visited with Dr. Farrell to discuss the AID procedure. No written consent or affirmative oral consent was given to Dr. Farrell by either party. Most of the conversation was between John and Dr. Farrell.

4. In 1984, Ritaray made visits to Dr. Farrell which were known to John.

5. John was aware that Ritaray was using a basal thermometer and charting her body temperature.

6. John knew about the sonograms Ritaray had and paid for them.

7. John knew about Ritaray's appointment for the AID procedure.

8. John took Lamaze classes with Ritaray.

9. John and Ritaray discussed child care and breast feeding.

10. John and Ritaray discussed names for the baby.

11. John went with Ritaray to the hospital for J.D.'s birth.

12. John never objected to his name on the birth certificate showing him as the father.

13. J.D. was listed as a dependent on John and Ritaray's 1985 Federal tax return which John had caused to be prepared.

14. During the six weeks after J.D.'s birth and leaving for Illinois, John helped care for J.D.

15. John bought a present for J.D. for Christmas 1985.

16. The settlement agreement proposed by John in early 1986 had the following provisions:

A. The parental responsibility for the minor child of the parties, namely, John David Adams, born August 4, 1985, shall be shared by both parties.

B. The primary custody and physician residence of said minor child shall be with the wife. The husband shall have the right to visit with and be visited by the minor child at reasonable times and places.

C. The husband shall pay to the wife, as and for child support, the sum of $50. Payable on the 15th and 30th of each and every month commencing March 15, 1986, for a total of $100 per month, and continuing each and every month, until such time as said minor child reaches his majority, marries, or becomes self-supporting, whichever comes first.

17. Other than John's alleged conversations with Ritaray which she denied, John had no conversations with anyone else in which he denied consent to Ritaray's AID procedure, or in which he disclaimed parental responsibility for J.D. until after dissolution proceedings were instituted.

18. John made no written statement or communication to anyone at all in which he denied consent to Ritaray's AID procedure, or disclaimed parental responsibility for J.D., until after the dissolution proceedings were filed."

John disputes the trial court's finding of actual consent for several reasons. First, he points out that in the out-of-State cases relied on by the trial court, the courts found evidence of express consent, oral, written, or both, and that the express consent came from either some positive act before the AID procedure was done or, in other cases, the post-procedure actions were long term, unequivocal, and unmistakably ratifying, such as a husband holding out the child as his own for years. (*In re Marriage of L.M.S. v. S.L.S* (Wis. App. 1981), 105 Wis. 2d 118, 312 N.W.2d 853.) According to Ritaray, after the first conversation with Dr. Farrell, neither John nor she had decided what to do, while John stated he knew at once that he couldn't agree to the AID procedure.

Secondly, John argues that although Ritaray gave some general testimonial statements that John "knew and consented" and that John was "supportive of her decision," her testimony as to the various instances she relied on were discredited, impeached, or were inconsistent with her other testimony.

Thirdly, John also asserts that the doctrine of equitable estoppel is not applicable here. To be estopped, a party, by word or conduct, must have reasonably induced another to rely on his representations and led the other, as a result of that reliance, to change his position, to his injury. (*Payne v. Mill Race Inn* (1987), 152 Ill. App. 3d 269.) In the cases from other jurisdictions, the focus is on the fact that the wife would not have undergone the AID procedure in the absence of the husband's consent. John asserts that Ritaray gave no evidence of any activity by John that affirmatively induced her to proceed with the insemination.

Finally, John disagrees with the trial court's reliance on the fact that he signed authorization for the tests, paid doctor and hospital bills, stayed with Ritaray during her labor, accepted joint responsibility for J.D. in the settlement agreement he prepared, and listed J.D. as a dependent on his Federal income tax return to show that John actually consented to the AID procedure. John, because of his work,

routinely signed all authorizations for tests; most of the medical expenses were paid for by the Navy; Ritaray, when pressed, could only recall two instances in six weeks when John helped with J.D.; the income tax return was Ritaray's, as well as his own; and in order to take advantage of the "inexpensive" Florida divorce procedure, the agreement had to be fair and conscionable, or it risked being rejected.

Of all of the above, the two strongest reasons for holding John consented to the AID procedure are the listing of J.D. on the income tax return and the provision of the proposed settlement agreement. John's excuse that the income tax return was Ritaray's, as well as his own, is not good enough. He could have filed a separate return, even though not as financially advantageous; and since he chose to take advantage of the fact that J.D. was his dependent, knowing all the facts, he should not be permitted to deny him as such. John's other arguments are primarily based on his disagreement with the trial court's assessment of the credibility of the witnesses. Yet the trial court acknowledged in its memorandum that the testimony of both parties was impeached and discredited to a certain extent. Finally, although in the majority of the cases from other jurisdictions there was no question that at one time there had been actual consent (the question in more cases was whether it had been withdrawn), Ritaray alleged that John had orally consented, while John denied giving such oral consent, thus leaving a question of credibility for the trial court to decide.

The trial court found that John was intelligent, well educated, and very much in love with his wife. John contended that his love for his wife allowed him to be manipulated by her. All the testimony perceived him as living a double life, keeping his military life separate from his home life. The trial court assessed John's situation as follows:

"An intelligent, knowledgeable husband cannot reasonably act yes, think no, and expect a young persistent wife, anxious would-be-mother, to see through the action of yes to the claimed thoughts of no. It is entirely possible that there were conversations where J [John] tried to discourage R's [Ritaray] actions, mainly due to the growing debts. But R kept pressing and J kept listening and cooperating. In the end, J gave into R's actions to go through with the AID procedure so R would be happy and satisfied in mothering a child.

Taken in its best light, it was J's love that surrendered to open consent; taken in its worst light it was J's private thoughts that concealed a grudging consent. Taken in any light,

whether by allowance or acquiescence, it is legal consent suffi-
cient to estop J from now disclaiming parental responsibility."

The dissent argues that the trial court erroneously shifted the
burden of proof to John rather than requiring Ritaray to produce
clear and convincing evidence of estoppel. The dissent also argues
that this error was compounded when the trial court subjected John's
testimony to strict scrutiny.

 One who asserts an affirmative defense has the burden of
proving it. (*Capitol Plumbing & Heating Supply, Inc. v. Van's Plumb-
ing & Heating* (1978), 58 Ill. App. 3d 173, 175.) The dissent ignores
the fact that the issue of nonpaternity was raised first by John as an
affirmative defense. As part of his answer to Ritaray's petition for
dissolution of marriage, John filed an affirmative defense in which he
alleged that Ritaray "without the consent or knowledge of the Re-
spondent" agreed to artificial insemination with donor sperm. In his
second amended affirmative defense, John repeated the allegations of
his original affirmative defense and, further, contended that he "did
not consent, either orally or in writing, to his wife's being artificially
inseminated" and that he "continuously and strenuously objected to
his wife's suggestions that she be artificially inseminated by a third
party donor." Ritaray denied those allegations.

In his written opinion, the trial court noted that in the case of
*People ex rel. Adams v. Mitchell* (1980), 89 Ill. App. 3d 1023 (dealing
with the issues of paternity and legitimacy), the reviewing court cau-
tioned that the party asserting estoppel carries the burden of proof.
Later in the written opinion, the trial court stated as follows:

"John's burden on the affirmative defense will be measured
with the rebuttable presumption of initial consent under Rita's
burden on the issue of estoppel."

Thus, we cannot agree with the dissent that the trial court improperly
shifted the burden of proof to John. Rather, we find that the trial
court weighed the evidence, cognizant of the respective evidentiary
burdens of the parties.

Further, while the trial court commented in its written opinion
that, based upon prior paternity cases, it appeared that in AID cases
the testimony of a marital party who asserts nonpaternity is subject
to careful scrutiny, the trial court then stated that the "testimony of
both parties has been carefully measured up against the unrebuted
[*sic*] facts."

On the basis of the above, we conclude that the trial court was
correct in determining that there was actual consent by John to the
AID procedure.

Next, John contends that the award of child support constituted an abuse of discretion.

■■■ Section 505 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 505) provides for the imposition of child support obligations and determines the amount based upon certain statutory criteria. The minimum amount of support for one child under the statutory guidelines is 20% of the payor's net income. (Ill. Rev. Stat. 1985, ch. 40, par. 505(1).) The statute also provides that the guidelines shall be applied in each case unless the court, based upon the relevant factors, finds a reason for deviating. Such relevant factors include the financial resources and needs of both the noncustodial and the custodial parent. "Net income" is defined as the total of all income from all sources, minus the following deductions:

"(a) Federal income tax (properly calculated withholding or estimated payments);

(b) State income tax (properly calculated withholding or estimated payments);

(c) Social Security (FICA payments);

(d) Mandatory retirement contributions required by law or as a condition of employment;

(e) Union dues;

(f) Dependent and individual health/hospitalization insurance premiums;

(g) Prior obligations of support or maintenance actually paid pursuant to a court order;

(h) Expenditures for repayment of debts that represent reasonable and necessary expenses for the production of income, medical expenditures necessary to preserve life or health, reasonable expenditures for the benefit of the child and the other parent, exclusive of gifts." Ill. Rev. Stat. 1985, ch. 40, pars. 505(3)(a) through (3)(h).

In determining the child support award in this case, the trial court stated as follows:

"John's net income or income has been variously described as $2,800 which was his income when he was in Jacksonville; $2,610 now that he has moved to Illinois. There is $2,422 which is base pay. I believe the term net income really allows the subtraction of only certain elements from his pay. For example, even though John is paying on the mobile home, and the storage fee, that really has very little, if anything, to do with the production of his ordinary income. That happens to be something that is an albatross around John's neck at the moment

just because of it's [sic] presence and existence. Rather what I will subtract from the $2,610 is the $236 he is paying for medical and dental treatment either to Shawn and/or for the rest of the children John has [John's children from his first marriage], the $338 he is paying for child support also which has been increased now to a level of $400 which is child support for the twins, $168 also called $200 which he is paying for Shawn. The credit obligations which I have chosen to be permitted really concern those payments which were manifest during the bankruptcy proceeding which now have surfaced again because of various lines of credit.

The Court has allowed the subtraction of $550 from the $2,610 figure as well. If you add those various subtractions together, I think you will come up with somewhere in the neighborhood of $1,400 as an approximation, and if I subtract the $1,400 from the $2,610, I set a value of about $1,200 of net income which is a base from which this Court can project the payment of child support. I will ascribe twenty percent against that figure for payment of $240, but I would also note that against his total net income or gross net income, if you want to use that term, I have used Mr. Smith's [Ritaray's attorney] formula of 42 percent, but I use it against his base pay. In other words, $2,422, and I break it down into the ten percent application would yield about $240 per month as and for child support, and that will be this Court's award of child support."

■■ The amount of an award of maintenance or child support is a matter within the sound discretion of the trial court, and the award will not be disturbed on appeal absent an abuse of discretion. Such an abuse of discretion occurs only where no reasonable man would take the view adopted by the trial court. *In re Marriage of Dwan* (1982), 108 Ill. App. 3d 808, 812.

■■ John contends that the trial court abused its discretion in that it failed to consider the tremendous debt load John was ordered to assume in setting the child support amount. While John received an almost equal amount of assets as debt, these assets cannot be liquidated, *i.e.*, his pension cannot be tapped to meet expenses and the motor home is unsalable.

The record is clear that the trial court considered the statutory factors in determining the amount of child support awarded. Considering John's educational background and position in the Navy and Ritaray's lack of a high school diploma and her dependency on welfare and her parents for support, the trial court's support order was not

an abuse of discretion.

Next, John contends that the trial court abused its discretion in appointing an attorney for the minor child and ordering John to pay 60% of the fees for the attorney for the minor child. However, John did not object at the time the appointment was made and did not in fact object to it at any time prior to this appeal. Since he did not raise the issue in the trial court, he cannot raise it for the first time on appeal. *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141; compare *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108.

 The allowance of attorney fees in divorce proceedings rests within the discretion of the trial court, and the exercise thereof will not be interfered with unless such discretion is clearly abused. (*Brophy*, 96 Ill. App. 3d at 1117.) Neither party here disputed the reasonableness of the fees, only the division of responsibility of those fees. Given, however, the respective financial positions of the parties, we conclude that ordering John to pay 60% of the fees was not an abuse of discretion.

Finally, following oral argument in this case, the court-appointed attorney for the minor child filed a motion in this court to dismiss the appeal, or, in the alternative, to allow her to file a brief in this case, on the basis that she was not given notice of the filing of this appeal. In response, John filed a motion objecting to the motion to dismiss and withdrawing the issue he had raised concerning the appointment of the attorney for the minor child and the order requiring him to pay 60% of the attorney fees for said minor's attorney. We denied the motion to dismiss but granted the minor's attorney leave to file a brief, which was taken with the case. We also denied John's motion as moot.

For all of the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, J., concurs.

JUSTICE DUNN, concurring in part and dissenting in part:

In the face of increasing use of the AID procedure, the Illinois legislature enacted the Illinois Parentage Act (the Act) (Ill. Rev. Stat. 1985, ch. 40, par. 1451 *et seq.*), with the admirable intention of clarifying the legal relationships of the parties involved in the procedure. However, as noted by Representative Brummer during legislative debates on the Act, "it leaves totally ambiguous a situation of what happens when a married woman is artificially inseminated without the

consent of [her] husband." (83d Ill. Gen. Assem., House Proceedings, November 2, 1983, at 82.) For that reason, Representative Brummer recommended that passage of the Act be put off until a more comprehensive statute could be formulated. Nevertheless, the legislature passed the Act in its present form, leaving to the courts the difficult task of defining the legal status of the parties where a child is born of the AID procedure without the written consent of the mother's husband.

Although the Act currently provides that the consent of the husband of a woman who is to be impregnated by the AID procedure must be in writing (Ill. Rev. Stat. 1985, ch. 40, par. 1453), I agree that the lack of written consent should not conclusively bar the imposition of a support obligation on that husband. If a husband expressly consents to the performance of the AID procedure on his wife, but for some reason his written consent is not obtained, that husband should not be allowed to later disclaim his parental responsibilities for the child or children born as a result of the procedure. Likewise, I believe that if a wife undergoes AID because of her reasonable reliance on unequivocal conduct by her husband indicating his consent to the procedure, the husband may be estopped from denying legal responsibility. To hold otherwise might lead to unconscionable results never intended by the legislature.

Although I concur that the Act does not bar the imposition of a support obligation on an estoppel or waiver theory, I believe the trial court employed an improper standard of proof here in determining that John is J.D.'s legal father. While the trial court determined that the facts established circumstances of actual consent such that John should be estopped from denying the legal paternity of J.D., in so finding it employed a rebuttable presumption that John had consented to Ritaray's insemination. Moreover, the trial court indicated that, because John was denying consent, his testimony would be subject to careful scrutiny. In effect, the trial court required John to prove by clear and convincing evidence that he had not consented to the procedure. This standard of proof was not appropriate.

Had the legislature intended that the burden of proving nonconsent would be on the husband, the requirement of written consent would not have been necessary. If such a result were intended, the legislature could have dispensed with the written consent requirement and replaced it with a presumption of consent as is provided in other States. (See K.S. v. G.S. (1981), 182 N.J. Super. 102, 109 n.2, 440 A.2d 64, 68 n.2.) Instead, however, the Illinois legislature provided for written consent, in apparent recognition the possible problems of

proof where only oral consent is alleged. Since Ritaray was seeking the benefits of the Act even though she had not complied with the specific requirement that John's written consent be obtained, she should bear the burden of showing that the estoppel or waiver exception is applicable.

As noted by the majority, estoppel must be proved by clear, unequivocal evidence (*Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 96), yet the trial court found estoppel by improperly shifting the burden of proof to John rather than requiring Ritaray to produce clear, unequivocal evidence of estoppel. To compound this error, the trial court also subjected John's testimony to careful scrutiny. While careful scrutiny may be appropriate in the case of a natural birth where the husband denies paternity (see *In re Ozment* (1978), 61 Ill. App. 3d 1044), such scrutiny is not warranted where the Act's requirement of written consent has not been fulfilled. As Representative Brummer stated during legislative debate on the Act, the Act anticipates in its requirement of written consent that the normal presumption of legal paternity does not apply in the case of artificial insemination. (83d Ill. Gen. Assem., House Proceedings, November 2, 1983, at 82.) Contrary to the procedure employed here, it is the party claiming estoppel whose conduct may be scrutinized. (*Gary-Wheaton Bank*, 130 Ill. App. 3d at 96.) Scrutiny of Ritaray's testimony and conduct would appear especially appropriate considering her determination to start a family despite her husband's reluctance and the family's impending bankruptcy.

Because the trial court applied an improper standard of proof in this matter, I would reverse and remand this case for further consideration. Therefore, I express no opinion as to whether, applying the proper standard of proof, John should be estopped by either oral consent or actions to deny legal paternity of J.D. I think it necessary, however, to comment briefly on certain factors deemed significant by the majority. I find little significance in the fact that John paid for Ritaray's medical bills considering that those payments were actually part of John's Navy benefits. Of greater significance may be that John did not pay for the donor semen. I also find many of the actions John took after Ritaray became pregnant, such as discussion of child care, breast feeding, and other health matters, to be ambiguous at best. John had medical training, and it seems only reasonable that he would give advice to his pregnant wife even if he had not consented to her insemination. Even if John did accompany Ritaray to Lamaze classes without Ritaray having to first ask John's Navy superiors to do so, John may simply have been trying to make the best of a situa-

tion which he had not caused to happen.

I also find insignificant John's failure to voice his lack of consent to third parties. Reliance on that factor turns on its head the Act's requirement that consent, not lack thereof, be memorialized. Finally, I place the least weight on the fact that J.D. was listed as a dependent on John and Ritaray's joint income tax return. A taxpayer need not be the legal parent of a child to claim that child as a dependent. Moreover, since the return was joint, thereby combining the couple's incomes, they were entitled to list J.D. as a dependent, just as they listed John's other three children by his former wife as dependents. I would hesitate to force legal paternity on John simply because both he and Ritaray took advantage of Federal income tax laws.

In summary, although I agree with that part of the majority opinion which decides that a husband's written consent to the AID procedure is not absolutely necessary for imposition of a support obligation, I cannot join in that part of the opinion upholding the trial court's finding of actual consent because I believe the trial court utilized an improper standard to so find. I respectfully dissent.